**SOLAR FUEL COMPANY and Paul Schrekengost**

v.

**UNITED MINE WORKERS OF AMERICA and United Mine Workers of America, District No. 2.**

**Civ. A. No. 69–27.**

United States District Court,
W. D. Pennsylvania.

Aug. 10, 1972.

---

1. See Wright & Miller, Federal Practice and Procedure, Civil § 1029.

John A. Metz, Pittsburgh, Pa., Eugene A. Creany, Ebensburg, Pa., for plaintiff.

Willard P. Owens, Washington, D. C., Thomas Livingston, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER DENYING MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR IN THE ALTERNATIVE FOR NEW TRIAL

KNOX, District Judge.

This case is another in the series of actions against the United Mine Workers of America (herein called U.M.W.) for alleged violation of the antitrust laws as the result of the inclusion in the National Bituminous Coal Wage Agreement by amendment effective December 1, 1958, of a so-called protective wage clause, whereby the union agreed not to make any agreement or understanding with any signatory as to wages, hours or other conditions of work except on the basis and the terms of the National Agreement. The United States Supreme Court has on several occasions considered this clause and indicated that under the circumstances this may involve a violation of the antitrust laws. See United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Ramsey v. United Mine Workers of America, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). See also South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767 (6th Cir. 1970) cert. den. 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed. 2d 149.

In the instant case, plaintiff Solar Fuel Company through its membership in Somerset County Coal Operators Association was originally a signatory to the 1958 Agreement containing this protective wage clause. It later (1961–2) withdrew from membership in the association and beginning July 17, 1967, and extending through until the end of the year 1968 was involved in a bitter and violent dispute with the U.M.W. District No. 2 which included mines in Somerset County, Pennsylvania. It was stipulated that District No. 2 was an administrative arm of the international union of the U.M.W. of America.

The record is replete with evidence of extreme violence even to the extent on some occasions endangering life. Mine

vehicles were burned and run off cliffs. Mine buildings and equipment were burned and otherwise destroyed and damaged. Loads of coal were dumped on a road giving access to one of the mines. The roads were strewn with large nails inserted through bottle caps so as to puncture the tires of any vehicles passing, explosives were thrown and some people were set upon by mobs of 50 or 100 people and beaten and kicked. An injunction issued by the Court of Common Pleas of Somerset County limiting the number of pickets in an attempt to stop the violence was ignored and at times pickets in the number of 800 or 1,000 assembled on the roads leading to the mines, the group being so great as to overwhelm the State Police who came to the assistance of the sheriff in attempting to enforce the injunction. The judge issuing the injunction was defied in his courtroom by one of the officers of the international union who told him that the next day the pickets would be out in even greater numbers. There is evidence in the record from which the jury could infer as it did that these acts were fomented, encouraged, condoned or ratified by officers and representatives of both District No. 2 and of the International Union who did nothing to control the actions of the mobs or to discipline the union members involved although the evidence shows these officials and representatives were present on the picket line. The evidence further shows that Mr. Jock Yablonski, since murdered, throughout the course of negotiations insisted that the plaintiff coal company had to accede and submit to the terms of the protective wage clause and pay the royalties due per ton of coal into the Welfare and Retirement Fund of the Union and that the Union insisted that it was without power to negotiate a contract on any other terms. This, of course, was denied by the Union witnesses and thus presented a question for the jury which was submitted to them and by their verdict have found that plaintiff's version was true.

Plaintiff brought suit against the union in this court upon three causes of action.

(1) Unfair labor practices in violation of the National Labor Relations Act,

(2) Violation of the antitrust laws, particularly Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and

(3) A pendent state cause of action under Pennsylvania State law for destruction of real estate and personal property and interference with the business of the plaintiff's company. Paul Schrekengost, company manager, also joined in this suit claiming damages under the antitrust laws and for destruction and injury to his automobile and other personal property. At the time of trial the court instructed the jury that plaintiffs had made out no cause of action based upon unfair labor practices (N.T. 1053) but submitted the other two causes of action to the jury in the form of a special verdict containing special interrogatories. The jury's answers were as follows, (N.T. 1121):

"1. Do you find that the defendants, United Mine Workers and United Mine Workers District No. 2, were parties to an agreement in restraint of trade in violation of the antitrust laws under the previous instructions of the court? Answer: Yes.

"2. If and only if your answer to the above question is yes, what damages do you find were sustained by the plaintiff which were the proximate result of such violation of the antitrust laws? Solar Fuel Company: $125,000. Paul Schrekengost: Zero.

"3. Do you find the plaintiffs are entitled to recover from the defendants for wrongful acts in connection with the conduct of this strike? Answer: Yes.

"4. If your answer is yes, in what amount do you find plaintiffs are entitled to recover for these acts? Solar Fuel Company: $30,000. Paul Schrekengost: $2,000.

"5. Do you find that, in addition, plaintiffs are entitled to punitive damages for the wrongful acts of the defendants in the conduct of the strike? Answer: Yes.

"6. If your answer is yes, what amount of punitive damages do you award to plaintiffs? Solar Fuel $15,000. Paul Schrekengost: $1,000."

When the verdict was rendered, the court further interrogated the jury as to whether the amount of $30,000 awarded the company in the answer to Question 4 was included in the $125,000 awarded in question number 1 or whether the $30,000 was intended to be an addition thereto. The jury all responded that the $30,000 was in addition to the $125,000. (N.T. 1122–23). Since the jury verdict was against both defendants, the court trebled the $125,000 to $375,000 and entered judgment on this amount plus $45,000 being the total of actual and punitive damages awarded the company under the pendent state cause of action plus judgment in favor of the plaintiff Paul Schrekengost for $3,000 as awarded in the answers to questions 4 and 6. It will be noted that the jury's verdict was against both defendants although they had been told (N.T. 1081) they could find against either or both.

The defendants have now moved for Judgment Notwithstanding the Verdict (Judgment in Accordance with Motion for Directed Verdict) or in the Alternative for a New Trial alleging numerous reasons. The main issues were thoroughly briefed and argued by counsel. In view of matters brought to our attention after the argument by plaintiff's counsel, we ordered a reargument as to the question of whether the protective wage clause was in effect at the time of the events complained of from July 17, 1967, to October 1, 1968. This reargument has been held and this question has been rebriefed and after thorough consideration, we have determined that we must deny defendant's motions.

1. *Rescission of Protective Wage Clause*

At the threshold, we are met with defendant's present main contention which was the subject of the reargument viz: that the protective wage clause was repealed by amendments to the National Agreement dated April 2, 1964, and therefore was not in effect in 1967–1968 and can form no basis for any cause of action based upon the antitrust laws. It will be noted that even if this argument is accepted, it does not wipe out plaintiff's claims under the pendent state causes of action as covered by the jury's answers to questions 3–6, inc.

The protective wage clause, which is the heart of the matter, is contained in the amendment of December 1, 1958.[1]

1. "The United Mine Workers of America (which, as used in this Clause, includes all of its Districts, Local Unions, Officers or Agents) and the Operators signatory hereto affirm their intention to maintain the integrity of this contract in all of its parts. The objective of this contract is to provide the maximum possible continuity and stability of employment under the conditions set forth herein. The parties hereto agree that bituminous coal mines shall be so operated as not to debase or lower the standards of wages, hours, safety requirements and other conditions of work, established by this contract. The parties recognizing their obligation each as to the other to exercise all possible efforts and means to attain these objectives further agree as follows:

A. During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor will it permit any agreement or understanding covering any wages, hours or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto.

B. It is recognized that when signatory operators mine, prepare or procure or acquire under subcontract arrangements, bituminous coal mined under terms and conditions less favorable

In addition to the language quoted in the footnote, the union and operators bound themselves to undertake certain detailed steps to carry out the terms of the protective wage clause as more fully set forth in the ensuing paragraphs of the agreement.

The union claims that this clause was wiped out and rescinded by the amendments of April 2, 1964.[2] The union

than those provided for in this contract, they deprive employees of employment opportunities, employment conditions and other benefits which these employees are entitled to have safeguarded, stabilized and protected. Accordingly, the Operators agree that all bituminous coal mined, produced, or prepared by them, or any of them, or procured or acquired by them or any of them under a subcontract arrangement, shall be or shall have been mined or produced under terms and conditions which are as favorable to the employees as those provided for in this Contract.

'Procured or acquired under a subcontract arrangement' means any contract, lease, license, agreement, arrangement or understanding pursuant to which the signatory operator acquires coal, either as principal or agent, directly or indirectly from a producer other than such signatory for delivery to a person other than such signatory.

The obligation assumed hereunder shall not affect any agreement in effect as of the date of execution of this contract: provided, however, that any operator signatory hereto who is a party to any agreement inconsistent with the obligations assumed hereunder shall not maintain such inconsistent agreement in effect beyond the first date at which such agreement may be terminated by him in accordance with its terms.

The Operators signatory to this agreement shall so conduct their own operations (whether operated directly or indirectly, or through subsidiaries or affiliates) so as to fully comply with their obligations under this Clause. The obligation of each Operator signatory hereto, which is several and not joint, to fully perform all the conditions in this paragraph B contained, shall be a direct and continuing obligation of said Operator during the life of this agreement.

As a part of the consideration for this agreement, the Operators signatory hereto agree that this Clause covers the operation of all the coal lands, coal producing or coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this Agreement) be put into production or use. The said Operators agree that they will not lease, license, or contract out any coal lands, coal producing or coal preparation facilities as a subterfuge for the purpose of avoiding the application of this Clause."

2. "WHEREAS on September 29, 1952, and at various dates subsequent thereto, certain coal associations, companies and individuals (generally referred to as 'Operators'), in their association, company and individual names and capacities, executed with the United Mine Workers of America an Agreement denominated 'National Bituminous Coal Wage Agreement of 1950 as Amended September 29th, 1952'; and said Operators, signatory to this agreement, have now negotiated with the United Mine Workers of America *certain additional amendments* to said 'National Bituminous Coal Wage Agreement of 1950' and it is the agreement and intent of all parties hereto to amend and supplement and *as amended and supplemented* to carry forward and preserve the terms and conditions of said 'National Bituminous Coal Wage Agreement of 1950 as Amended September 29th, 1952', said 'National Bituminous Coal Wage Agreement of 1950', and all previous Agreements as therein provided:

NOW, THEREFORE, THIS AGREEMENT, effective April 2, 1964, by and between the coal operators, associations, companies and individuals signatory hereto and by and between such other and additional associations, companies and individuals as may hereafter become signatory hereto (hereinafter referred to as 'Operators') as parties of the first part, and the International Union, United Mine Workers of America (hereinafter referred to as 'Mine Workers') on behalf of each member thereof, as party of the second part, covering all of the bituminous coal mines owned or operated by said first parties, amends, modifies and supplements *and, as amended, modified and supplemented*, carries forward and preserves the terms and conditions of the 'National Bituminous Coal Wage Agreement of 1950 as amended September 29th, 1952', the

claims that as a result of these amendments all that remained was the original National Bituminous Coal Wage Agreement of 1950 as amended September 29, 1952, plus the amendments contained in the agreement of April 2, 1964.

■ After the original argument at which, as will be discussed more fully hereafter, the defendant for the first time clearly advanced this issue in the case, plaintiff's counsel commendably called to the court's attention the dicta in certain cases which seemed to support defendant's position. After studying these cases and the language of the agreement, we have concluded that defendant's position is not well taken and that the protective wage clause was in effect in the years 1967–1968 until expressly rescinded by the National Bituminous Coal and Wage Agreement of 1968, effective October 1, 1968.

In the Ramsey case as tried in the District Court in 1965, 265 F.Supp. 388 (E.D.Tenn.1967) we find this language: "In the 1964 Amendment of the National Bituminous Coal Wage Agreement, the protective wage clause was eliminated *or so the Union contends.*" This, of course, was not necessary to the court's decision and is merely a recognition that the union made the same representation in that case that it now makes here.

Again, in South-East Coal Co. v. U.M.W. of America, supra, the court said (434 F.2d p. 780): "The Protective Wage Clause was dropped from the Agreement in that year (1964)." Again, this was unnecessary to the court's decision which left untouched the verdict of the jury and judgment thereon against the union which had been rendered thereon in the lower court.

The third case involving this clause and the question now before us is Riverton Coal Co. v. U. M. W., 453 F.2d 1035 (6th Cir. 1972) which was not an anti-trust action at all but was rather a case for damages under Section 303 of the Labor Management Relations Act. This arose from a strike which ended on April 19, 1964, followed by another strike in 1966. In other words, this was a suit for violation of the no-strike clause in the agreement. The court at page 1039 did say: "The 1964 amendment contained the so-called '80-cent penalty clause' and the 'coal lands clause' which Riverton objected to as being illegal. The Protective Wage Clause was dropped from the agreement in that year." Here again, this was dictum unnecessary to the decision in the case that the union was liable in damages for violating the no-strike clause of the agreement.

As above stated, we have concluded that there is no evidence that the protective wage clause contained in the 1958 amendment was terminated by the 1964 amendment and that as a matter of fact it was not terminated until the 1968 agreement, effective October 1, 1968. We observe that the first whereas clause in 1964 recited that the parties have negotiated certain *additional amendments* to the National Bituminous Coal Wage Agreement of 1950 and it is the agreement and intent of all parties hereto to amend and supplement and *as amended and supplemented* to carry forward and preserve the terms and conditions of said National Bituminous Coal Wage Agreement of 1950 as amended September 29, 1952, said National Bituminous Coal Wage Agreement of 1950 and all previous agreements as therein provided. The second paragraph provides that this agreement "amends, modifies and supplements and *as amended, modified and supplemented* carries forward and preserves the terms and conditions of the National Bituminous Coal Wage Agreement of 1950 as amended September 29, 1952, and the National Bituminous Coal Wage Agreement of 1950 and all previous agreements as therein provided." Certainly if the parties had intended to wipe out such an important matter as the protective wage clause,

'National Bituminous Coal Wage Agreement of 1950', and all previous Agreements as therein provided, such amendments, modifications and Supplements being as follows, to wit:" (Emphasis added.)

they could have clearly and unambiguously set forth their intention to do so. That they did know how to do so is shown by the definite and certain language set forth in the 1968 agreement (plaintiff's Exhibit 209) wherein on page 14 it was clearly set forth:

"Any and all provisions of any contracts or agreements between the parties hereto or some of them whether national, district, local or *otherwise providing for a protective wage clause* and a modification of this agreement or said agreements if a more favorable wage agreement is entered into by the United Mine Workers of America, are hereby *rescinded, cancelled, abrogated and made null and void.*"

The rule is that the burden is on a party claiming rescission or abandonment of a contract to prove it. Fritz v. Lyons, 185 Pa.Super. 549, 138 A.2d 182 (1958). When the execution of a written contract is admitted a party claiming rescission or abandonment has the burden of proving it. Achenbach v. Stoddard, 253 Pa. 338, 98 A. 604 (1916). (This case incidentally also holds that you cannot submit a case to a jury on one theory and then question the correctness of the submission.) An agreement to rescind must be clearly expressed, 17 Am.Jur.2d Contracts, Sec. 490.

This case is somewhat similar to the problem which confronted the Pennsylvania Supreme Court in Johnson's Trust, 435 Pa. 303, 255 A.2d 571 (1969) where it was held that a second codicil to a will ratifies and confirms an intermediate codicil although not specifically mentioned. In other words, the will is ratified and confirmed as it stands including the intermediate codicil on the date of execution of the second codicil. By the same token, when the 1964 agreements referred to the agreements of 1950 and 1952 as amended and modified, this carried with it all intermediate amendments including the protective wage clause in the amendment of 1958.

There is a further reason why we should not permit the issue of prior rescission of the protective wage clause to be injected into the case at this time. We have thoroughly examined the record in this case and nowhere was this issue raised in the pleadings, in the pretrial narrative statements, at the pretrial conference or during the trial itself. It is noted that in the pretrial stipulation, paragraph 14, which was offered in evidence, defendants admitted that they had attempted to cause plaintiff to enter into a contract with defendants in the same form as the National Bituminous Coal Wage Agreement as amended. Exhibit 208 containing the original agreement and the various amendments including the protective wage clause was offered in evidence on page 29 without objection by the defendants. It was specifically stated that it was offered in evidence as being in effect during the period July 17, 1967, through December 6, 1968.

We have combed the record and find nothing therein relative to this issue prior to page 1044 of the transcript of trial when the evidence was closed and the court was conferring with counsel relative to instructions. The court ruled that the jury was to decide whether or not the U.M.W. did as a matter of fact try to enforce this protective wage clause. At the top of the page, counsel made an oblique reference with the cryptic remark "and the period of that contract was not 1967–1968". This apparently however had reference only to the question of whether Solar Fuel was a signatory within the terms of the agreement having resigned from the Coal Operators Association some years previously. The court did however rule that Solar Fuel was originally a signatory through its association and was therefore one of those covered by the terms of the agreement.

Nothing further was said about the rescission of the protective wage clause until page 1106 after the charge of the court and after the jury had been deliberating some hours and had returned with a question asking the court to further explain the United States Supreme Court's decision relative to the

protective wage clause. At page 1105, Mr. Livingston, defendants' counsel, for the first time mentioned this issue when he said: "I think there is a question whether that PWC was properly part of the agreement in effect in 1967." At page 1114, after further discussion, defendants' counsel stated that his objection was that this particular clause should not be considered a part of this contract and at page 1120, counsel took exception to the instruction of the court to the jury as to the use of this clause.

■ In other words, not until after the jury was charged and had retired for deliberation with the case completely submitted to them did defendants' counsel inject this issue into the case. As previously stated, a party cannot submit a case to a jury on one theory and then after summation adopt an entirely different theory. See Zweig v. Bethlehem Supply Co., 186 F.2d 20 (5th Cir. 1951).

Further, to permit this new theory to be injected at the close of the case would completely undermine the integrity and effectiveness of the pretrial procedures and pretrial order in this case. Pretrial narrative statements had been filed by both parties pursuant to Rule 5–II of this court and after the pretrial conference, a pretrial order was entered which provided that the parties should be limited to the issues set forth in the pretrial statements and pretrial stipulation. Under our Rule 5–II(G),[3] defendant was limited to the defenses disclosed in the pretrial narrative statement or at the pretrial conference with certain exceptions not here important. While we appreciate that there may be a further variation from pretrial procedures in order to prevent manifest injustice to a party, it appears to the court that to allow the interjection of this ambiguous defense after the case has gone to the jury would only serve to inflict an injustice upon the plaintiff who had not previously been apprised of any such defense.

Recently, the Court of Appeals of this Circuit in Shuber v. S. S. Kresge Co., 458 F.2d 1058, at page 1061 (3d Cir. 1972) had this to say about a similar situation:

"Going on, however, Judge Weber also stated: '[T]he Court has an interest to support the integrity of its pretrial procedures. The Pretrial Order in the case binds and limits the parties to what they have presented and revealed in their Pretrial Narratives and at the Pretrial Conference. Neither at the Pretrial Conference, nor in the trial was this new line of evidence suggested. We must either require adherence to our Pretrial Rules or abandon them utterly in this case. We think that the interests of the efficient administration of justice require their enforcement.' With this statement of the trial Judge we are thoroughly in accord."

■■ We therefore hold that the injection of this alleged defense of rescission of the protective wage clause into the case came too late. We also overrule defendants' motions for new trial insofar as they claim the verdict was against the weight of the evidence or unsupported by the evidence for the reason that the great weight of the evidence indicated that the defendants had attempted to force this protective wage clause upon Solar Fuel despite its alleged ruinous effect upon the plaintiff and that the union officials both district and international had refused to negotiate with plaintiff on any terms other than a contract including protective wage clause. By their agreement with the large operators the unions had disabled themselves from negotiating on any other terms.

3. "Failure to fully disclose in the pretrial narrative statement or at the pretrial conference the substance of the evidence as to liability, defenses, and damages proposed to be offered at the trial, will result in the exclusion of that evidence at the trial. The only exceptions will be (1) matters which the Court determines were not discoverable at the time of the pretrial conference, (2) privileged matter, and (3) matter to be used solely for impeaching purposes."

## 2. *Liability of Union For Violation Of Antitrust Laws.*

The defendants next claim that the court should not have submitted to the jury the question of whether defendants' conduct in entering into the protective wage clause with the coal operators and in attempting to impose it by force and violence upon Solar Fuel Company was a violation of the antitrust laws from which of course unions are generally exempt under 15 U.S.C. § 17. They also claim that the defendant unions cannot be held responsible for unlawful acts of individual officers, members or agents except upon "clear proof of actual participation in or actual authorization of, such acts, or ratification of such acts after actual knowledge thereof." 29 U.S.C. § 106, and that there was an absence of clear proof as required by this act to send the case to the jury. The court at N.T. 1050 and 1051 painstakingly explained to the jury that with respect to liability of the labor unions the jury must find clear proof of the "direction, authorization, participation in or ratification of such acts by the defendant as they are above explained". The jury was further told that they could consider the presence of the organizers on the picket lines, their participation and instructions to pickets, their repudiation or lack of repudiation of alleged misconduct and disciplinary action taken or not taken against individuals. Clear proof was properly defined as "clear, unequivocal and convincing proof". It was differentiated from the requirement of proof beyond a reasonable doubt in criminal cases and it was explained to the jury that this standard of proof applied not only to the charges of violation of the antitrust laws but also to the claims under Pennsylvania law for destruction of property. The jury was however informed that this standard of proof only applied to the question of whether the defendant unions or either of them are liable for the alleged acts of misconduct and it had no application to other acts in the case as to which the plaintiff had the usual burden in civil cases of proof by a preponderance of the evidence.

█ It appears that these instructions were in strict conformity with the requirements of U. M. W. v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and Ramsey v. U. M. W., 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). As above noted there was ample evidence from which the jury could find that there was clear proof that officers and organizers from both the district and the international were present at the times of occurrences complained of, that they participated in and condoned them, and failed to take any disciplinary action against the union members guilty of misconduct. While much of this testimony was oral, nevertheless it certainly measured up to the standards of "clear proof".

The jury was further told at N.T. 1056 that labor unions generally were exempt from the antitrust laws and were free to pursue their legitimate ends in securing better wages and working conditions for their members without being held liable under the antitrust laws. But the jury was also instructed that the crucial point in this case was whether under these circumstances the agreements were in violation of these laws and whether the protective wage clause as sought to be enforced by the unions in this case had become and was used as an agreement in restraint of trade in violation of the Sherman Act the purpose of which had been explained to the jury. At page 1058, the court read to the jury the following quotation from U. M. W. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) which clearly summed up to the jury the problems:

"Now, the United States Supreme Court, with reference to this matter, has said that 'A union may make wage agreements with a multi-employer bargaining unit'—that is the coal operators—'and may, in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could

be made out on evidence limited to such union behavior, but we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry, and the union is liable with the employers if it is true, even though the union's part in the scheme is an undertaking to secure the same wages, hours, or other conditions of employment from the remaining employers in the industry. Thus, the relevant labor and antitrust policies compel us to conclude that the alleged agreement between the U.M.W. and large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws."

The jury was then told that it did appear that the union by the use of this language in the contract had disabled itself from negotiating under less burdensome terms with other operators, and that if the jury believed the plaintiff's testimony that the union had throughout refused to negotiate any of the terms of the national agreement as a result of having been disabled by the so-called protective wage clause, that the union insisted upon these terms and no others, that then the jury would be justified in finding that the union was a party to an agreement used in restraint of trade in violation of the antitrust laws. (N.T. 1060). In response to a question from the jury these instructions were again repeated at pages 1094–1102. The jury came back a second time and asked to have the United States Supreme Court decision read to it and the matter was again gone into at page 1114.

### 3. *Itemization of Damages.*

■ In the original motion, complaint was made that the court erred in allowing the jury to take with it a tabulation of damages claimed by the plaintiffs. It will be noted that plaintiff's evidence indicated that the damages were $260,000 for violation of the antitrust laws whereas the jury only returned a verdict of $125,000 thus indicating that they reviewed this matter very carefully. Sending out of tabulations or itemizations of damages claimed with cautionary instructions as here that they are only for the guidance of the jury and the jury is to make its own determination is certainly not improper. Shane v. Warner Mfg. Corp., 229 F.2d 207 (3d Cir. 1956).

■ Defendants in their original Motion for Judgment Notwithstanding the Verdict or for New Trial filed December 27, 1971, alleged six reasons most of which we have covered heretofore in this opinion. On February 23, 1972, twenty seven additional reasons in support of defendant's Motion for Directed Verdict or for New Trial were filed. None of these additional reasons were briefed or argued at time of argument. It has been held that the court is not required to examine all of the grounds for a new trial set forth in the motion but which are not set out or argued in a brief or argument. Clay v. Southern Ry. Co., 284 F.2d 152 (5th Cir. 1960). In the absence of argument or brief disclosing to the trial judge exactly why the defendants believe they are entitled to a new trial for these additional reasons, we do not believe that he is required to research by himself and then conclude what arguments could be advanced for or against the additional reasons for new trial. We will say that we have examined the reasons advanced in detail which were neither briefed nor argued and do not consider them to be of sufficient merit to warrant further discussion in this opinion. For all of the above reasons, the Motion for Judgment Notwithstanding the Verdict and Motion for New Trial will be denied.