FIRST VIRGINIA BANKSHARES,
Plaintiff-Appellee,

v.

Alan BENSON et al.,
Defendants-Appellants.

No. 75–3604.

United States Court of Appeals,
Fifth Circuit.

Sept. 29, 1977.

Rehearing and Rehearing En Banc
Denied Nov. 14, 1977.

Alva C. Caine, Neal C. Newell, Birmingham, Ala., for Benson.

James E. Clark, Birmingham, Ala., Albert E. Jenner, Jr., Robert L. Bombaugh, Gregory G. Wille, Leonard A. Nelson, Chicago, Ill., for Heller.

Hobart M. McWhorter, Jr., Samuel H. Franklin, Birmingham, Ala., for plaintiff-appellee.

Before THORNBERRY and GEE, Circuit Judges, and MARKEY,* Chief Judge.

THORNBERRY, Circuit Judge:

First Virginia Bankshares (Bankshares), a commercial lending institution, sued another commercial lending institution, Walter E. Heller and Co. (Heller), and the former owners of a family-owned consumer finance company (the Bensons) for damages arising from alleged violations of §§ 12 and 17 of the 1933 Securities Act, 15 U.S.C. §§ 77*l*, 77q, § 10(b) of the 1934 Exchange Act and Rule 10b–5, 15 U.S.C. § 78j(b) and 7 Ala.Rev.Stat.Ann. §§ 109–111, which codify common law fraud. Bankshares claimed that Heller and the Bensons misrepresented material facts in connection with the merger of the Bensons' company into Bankshares. The court charged the jury only on the 10b–5[1] and fraud counts,[2] and directed

a verdict in favor of one of the individual defendants. The jury returned a general verdict of $1,000,000 against all defendants except one individual defendant, the Chief Financial Officer of the Bensons' company. Heller moved for judgment n. o. v., which the court denied. Heller and the individual defendants found liable appeal on the fraud and 10b–5 counts. We affirm as to all defendants.

**I.**

The Bensons' consumer finance business, located in Birmingham, Alabama, was financed in large part through a rediscount agreement with Heller. This arrangement existed for a period of twelve years prior to the merger, and provided that Heller would loan funds to the Bensons to the extent of 80% of the outstanding balance of the Bensons' "eligible" notes receivable. All of the Bensons' receivables were pledged as security for the loan. The agreement required that in order to be considered by Heller as "eligible" for rediscount, a note must show some payment on it within the preceding ninety days. The rediscount agreement further authorized Heller periodically to examine the books and records of the company in order to confirm the recency of the payments on notes receivable and their eligibility for rediscount. Heller in fact conducted such examinations every three months. Under this arrangement, Heller became the principal creditor of the Bensons' company.

In September of 1971, one of these periodic checks of the Bensons' loans revealed that recent credits had been posted to several accounts, indicating payments on accident and health policies that were issued in connection with many loans. The Bensons' records did not permit verification of these payments, and there was evidence that Heller suspected falsification of the records. These questionable credits affected approximately $180,000 of the Bensons' accounts.

---

* Of the U. S. Court of Customs and Patent Appeals, sitting by designation.

1. For simplicity we refer to the cause of action under § 10(b) and Rule 10b–5 solely as the 10b–5 claim.

2. The trial court dismissed all claims against defendants (particularly Heller) except for the 10b–5 and Alabama fraud claims.

Heller summoned some of the Bensons to its offices, complained that the Heller examiners could not verify the validity of the payments in question, and requested the Bensons to institute better accounting procedures in this matter. The Bensons sent out a letter to all of their branch offices directing them to cease posting false accident and health claims. Heller did not exclude the affected loans from the collateral pool, and subsequently loaned the Bensons an additional $310,000.

Following its January 1972 examination, Heller notified the Bensons that their financial report was erroneous. The Bensons had reported a six-month operating profit of $144,567 for the six months ending December 31, 1971. Heller found that $353,194.38 worth of receivables did not qualify as assets. Heller adjusted net worth down by 40% of the total, and reduced the reported net income to show a net loss for the six months of $186,965.

Also about that time, the Bensons and Heller decided to terminate their rediscount agreement. At trial, Heller presented evidence that this was at the Bensons' instance, since they had constantly complained about the level of interest charged by Heller. The agreement to terminate assertedly was mutual. Bankshares contends that Heller was dumping the Bensons, and introduced into evidence a letter from Alan Benson to Heller, dated October 1971, expressing a desire to continue relations with Heller.

In any event, by January 1972, Heller knew that the Bensons were going to move on. And, perhaps as early as March, Heller knew that the Bensons were seeking to sell the company. In the course of the Bensons' efforts to sell, they generated the interest of several larger companies, including American Fletcher and Guardian Finance. Finally, they began talks with Bankshares. All of these overtures, discussions, and negotiations arose through the offices of Charles Michelman of M. L. Michelman and Co., a New York broker who enjoyed a wide reputation as a "finder" for the acquisition of consumer finance companies. The Bensons provided Bankshares with several credit references, including Heller. Bankshares requested Michelman to run a credit check on the Bensons' company. This, according to Michelman's testimony, is quite unusual in a purchase or merger situation; ordinarily, the buyer will run its own credit check. Nevertheless, Michelman agreed, and called Heller on May 24, 1972, without disclosing that he was acting for a potential buyer of the Bensons' company. He spoke with Robert Abrahams, the head of Hellers' rediscount division, who had handled the Bensons account. Michelman had met and was on a first-name basis with Abrahams. Michelman's inquires elicited the following information, as recorded in his memorandum concerning the call:

Bob told me their experience with Benson has been satisfactory for many years. Heller is aware that Benson is thinking of selling; but said that if Benson were not following this course, there is no doubt in his mind that more money could be made available to Benson. Bob characterized the operation as somewhat better than average, although there are areas of sloppiness in bookkeeping as they find in almost all of their clients. Benson has always met its obligations promptly. Bob characterized Alan [Benson] as capable and hard working and said that in his opinion, the operation is better now that Alan is running the show.

R. Vol. V at 1086–87.

At the time of this conversation, the Bensons had been in arrears by three weeks for interest for April (approximately $35,600). Though, prior to the telephone call from Michelman, the Bensons had submitted to Heller a check for the amount of the interest due, Heller had not negotiated that check. For, attached to the check were three slips signifying three recent checks against the Bensons' account that were returned for insufficient funds. Heller did not negotiate its check until May 26, after loaning enough money to the Bensons to cover the check. It is not clear from the evidence whether Heller had received the Bensons' check prior to the time of the telephone conversation.

Subsequently, in a periodic examination conducted from May 24 to June 16, Heller discovered that the Bensons had tampered

extensively with their records. In his report, the Heller examiner stated:

> Obvious efforts made to inflate assets and income were detected. Client has been actively seeking opportunity for merger, sale, other financing, etc. and evidently has been quite busy "doctoring" records to present a more favorable picture to prospects re the above.

R. Vol. VIII at 2296. Heller did not re-contact Michelman, and was never again directly asked about the Bensons' integrity by any other party to this lawsuit.

Independently, Bankshares engaged an auditing firm to conduct an audit of the Bensons' operation, and sent some of its own personnel to check the Bensons' records. The audit, while not involving independent verification with the Bensons' debtors, showed the books to be clean.

After all of this, Bankshares agreed to buy the Bensons' company. Bankshares' largest subsidiary bank, First Virginia Bank, entered into a rediscount agreement with the Bensons' company to provide interim financing. It also loaned the Bensons the money to pay off the debt to Heller, which had reached approximately $3,700,-000. In July 1972, Bankshares contacted Heller by telephone to inform them that pay down of the debt was about to begin. It is uncontroverted that at least after this telephone call, Heller knew that Bankshares was going to acquire the Bensons' company. By the end of August 1972, the Bensons had paid off the entire Heller debt with funds loaned by First Virginia Bank.

In March 1973, Bankshares merged with the Bensons' company in a stock-for-stock transaction, and the First Virginia Bank rediscount with the company was cancelled. Several months after the merger, Bankshares learned that the Bensons had engaged in several bad accounting practices and forms of fraud. The Bensons kept only one record for each consumer loan made—a ledger card. Some of the practices with respect to these cards were: (1) ledger cards were posted to reflect a payment when in fact no payment had been received, (2) payments were posted to ledger cards as accident and health insurance payments, when in fact the debtor had not made any insurance claim and no payment was made by any insurance company, (3) ledger cards of delinquent accounts were retyped and updated, giving the loan status a current appearance, (4) ledger cards were made up with reference to fictitious loans where there was no genuine borrower, and (5) payments received by the Bensons from bankruptcy court were spread around to a number of delinquent accounts rather than being fully applied to the account of the particular paying debtor. As of the date of the merger, 5,298 loans with an asset value of $1,365,563.51 were the subject of one or more of these practices. Had these loans, which should have been written off as losses in accordance with generally accepted accounting principles, not been included in the balance sheet, the Bensons' company would have been insolvent by approximately $650,000 at the time of the merger. Instead, the certified and warranted financial statement furnished Bankshares by the Bensons showed the net worth of the company to be about $850,000.

After the presentation of the evidence at trial, the court rejected the parties' requested instructions and delivered a charge that covered both 10b–5 and Alabama fraud, without expressly distinguishing between the two theories. In addition, the court distributed to the jury a written outline of the elements that the plaintiff had to prove in order to prevail. That outline read:

Elements of Plaintiff's Claim

1. Misstatement (or omission) by defendant.
2. Of a material matter.
   Alternate A: If in connection with purchase or sale of stock, can be an opinion.
3. Known to defendant.
   Alternate A: With reckless disregard by defendant for truth of the matter.
   Alternate B: Should have been known by defendant (Defendant had means to discover and duty to investigate, either by position or grounds to suspect.)
   Alternate C: Misstatement of existing fact with intent to deceive.
   Alternate D: Contractual assurance by defendant.

4. With intent to induce plaintiff to act.

    Alternate A: If in connection with purchase or sale of stock, sufficient if significance known (or should have been known) to defendant.

5. Reasonably relied upon by plaintiff.

6. To plaintiff's damage. Claimed to be:

    A. Price paid for stock.
    B. Fee paid to Michelman.
    C. Portion of contribution to capital.

## II.

Initially, we undertake to delineate the scope of liability established under Alabama fraud and Rule 10b–5. In *Ellis v. Zuck,* 409 F.Supp. 1151, 1157–59 (N.D.Ala.1976), the district court set out this discussion of the prohibitions of Alabama fraud:

[L]iability may arise from a willful deception, an innocent misrepresentation concerning an existing fact, a reckless misrepresentation made without knowledge of its falsity, or the suppression of a material fact rather than an active misstatement. *See, Standard Oil Co. v. Myers,* 232 Ala. 662, 169 So. 312 (1936) (willful deception); *Birmingham Broadcasting Co. v. Bell,* 259 Ala. 656, 68 So.2d 314 (1953) (innocent misrepresentation); *Southern Building & Loan Ass'n v. Holmes,* 227 Ala. 1, 149 So. 861 (1933) (statements recklessly made); *Groover v. Darden,* 259 Ala. 607, 68 So.2d 28 (1953) (suppression actionable). However, it is clear that before liability for nondisclosure or suppression of facts will arise there must be special circumstances which give rise to an obligation to disclose. *Hall Motor Co. v. Furman,* 285 Ala. 499, 234 So.2d 37 (1970).

The critical elements of an action for fraud generally include:

    (a) a false representation concerning an existing material fact, . . . ;

    (b) a representation which (1) the defendant knew was false when made, or (2) was made recklessly and without regard to its truth or falsity, or (3) was made by telling plaintiff that defendant had knowledge that the representation was true while not having such knowledge, *Hockensmith v. Winton,* 11 Ala. App. 670, 66 So. 954 (1914);

    (c) reliance by the plaintiff on the representation and that he was deceived by it, *Bynum v. Rucker,* 235 Ala. 353, 179 So. 241 (1938);

    (d) reliance which was justified under the circumstances, *Fidelity & Cas. Co. v. J. D. Pittman Tractor Co.,* 244 Ala. 354, 13 So.2d 669 (1943);

    (e) damage to the plaintiff proximately resulting from his reliance. *Smith v. Smith,* 266 Ala. 118, 94 So.2d 863 (1957). Of course, under certain special circumstances elements must be added to those listed above. As previously alluded to, in order for suppression of facts to be actionable a duty to disclose must exist. A number of cases construing Section 109 of the Alabama Code indicate a confidential or fiduciary relationship must exist. However, the types of relationships wherein a duty to disclose has been found indicate that the Alabama courts give little attention to the designation of the relationship, such as vendor-vendee, etc., but instead look to the relative bargaining positions of the parties. *See, Hall Motor Co. v. Furman, supra; Metropolitan Life Ins. Co. v. James,* 238 Ala. 337, 191 So. 352 (1939). Where one party has some particular knowledge or expertise not shared by the plaintiff a duty to disclose has been recognized. *Cf. Collier v. Brown,* 285 Ala. 40, 228 So.2d 800 (1969). . . .

Nevertheless, even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiry, he is bound not only to state the truth but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure. *Jackson Co. v. Faulkner,* 55 Ala.App. 354, 315 So.2d 591 (1975). So it is that if a franchisee raises a question the franchisor must avoid half-truths. *Maxwell v. Ratcliffe,* 356 Mass. 560, 562–63, 254 N.E.2d 250 (1969).

Recently, our own court has discussed some of the elements of Alabama fraud:

1314

Couched in terms of suppression of a material fact, that section is somewhat limited in scope. The party accused must be under an obligation to communicate the fact suppressed, and such an obligation may arise only from "the confidential relationship of the parties" or from "the particular circumstances of the case." When neither a confidential relationship nor special circumstances exist, the nondisclosure of a material fact is fraudulent only if done with intent to deceive. *Metropolitan Life Ins. Co. v. James*, 238 Ala. 337, 191 So. 352 (1939). A confidential relationship may exist between a vendor and a vendee, *Finklea v. Perryman*, 239 Ala. 450, 195 So. 551 (1940), or between a grantor and a grantee, *Standard Motorcar Co. v. McMahon*, 203 Ala. 158, 82 So. 188 (1919). In the absence of a confidential relationship, the particular circumstances of the case may give rise to an obligation to communicate the fact in question. Where the accused has superior knowledge of the suppressed fact and the defrauded party has been induced to take action which he might not otherwise have taken, the obligation to disclose is particularly compelling. *Chapman v. Rivers Construction Co.*, 284 Ala. 633, 227 So.2d 403, 410–413 (1969).

*Mann v. Adams Realty Co.*, 556 F.2d 288, p. 297 (5 Cir. 1977).

■ Rule 10b–5, as relevant here, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security.

A misstatement or omission encompasses patently false statements. Silence, or omission to state a fact, is proscribed only in certain situations: first, where the defendant has a duty to speak, secondly, where the defendant has revealed some relevant, material information even though he had no duty (*i. e.*, a defendant may not deal in half-truths). In determining whether the duty to speak arises, we consider the relationship between the plaintiff and defendant, the parties' relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant's awareness of plaintiff's reliance on defendant in making its investment decisions, and defendant's role in initiating the purchase or sale. *See White v. Abrams*, 495 F.2d 724, 735 (9 Cir. 1974) and cases cited therein.[3]

■ Rule 10b–5 incorporates a scienter requirement: The defendant must know of the falsity of the information, or must act in reckless disregard of its falsity, or must intend to deceive. Negligence in failing to discover the falsity of the information is not actionable on this ground. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5 Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974). An opinion or prediction is actionable if there is a gross disparity between prediction and fact. *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 489 (9 Cir. 1974).

■ The plaintiff must show that it reasonably relied on the information (or on the notion that it had received all mandated disclosure from the defendant), and exercise due diligence in examining the information otherwise available to it. *Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100 (5 Cir. 1970), *cert. denied*, 402 U.S. 998, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971).[4]

3. While the information must be "material" to fall within 10b–5, the information involved in this case is unquestionably material to the investment decision.

4. The reliance must have resulted in damage to the plaintiff, an element that is incontestable here.

A misstatement or omission comes within the purview of Rule 10b–5 only if made "in connection with the purchase or sale of a security." This requirement receives a broad reading, and is satisfied by the showing of a nexus between the defendant's actions and plaintiff's purchase or sale. *Woodward v. Metro Bank*, 522 F.2d 84 (5 Cir. 1975); *Shapiro v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 495 F.2d 228 (2 Cir. 1974). Sometimes this requirement is expressed in terms of causation; *List v. Fashion Park, Inc.*, 340 F.2d 457 (2 Cir. 1964) looked to "whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact." 340 F.2d at 463.

The case before us does not present many novel applications of 10b–5 or fraud liability. The uniqueness of the case proceeds from the generality of the court's charge made without express regard to the independence of 10b–5 and fraud causes of action, coupled with the jury's general verdict of liability. Since the jury's determinations stand encased in the fog of a general verdict, our review is circumscribed by the presumptions traditionally drawn in favor of jury verdicts. And our review of the trial court's charge proceeds on a similarly narrow route. In this situation, then, our conclusions and holdings must be regarded in the peculiar context in which they arise.

In light of this discussion, we turn to consider the defendants' points on appeal.

### A.

■ The Bensons raise three points on appeal. First, they claim that the district court erred in giving to the jury a written outline of the elements which Bankshares had to prove in its case. The court specifically and repeatedly instructed the jury, however, that the elements written down were contested and constituted only an outline of those items on which Bankshares bore the burden of proof. There is no reversible error here. *See Solar Fuel Co. v. United Mine Workers of America*, 346 F.Supp. 789 (W.D.Pa.1972), aff'd, 481 F.2d 1399 (3 Cir. 1973); *DePinto v. Provident Security Life Ins. Co.*, 374 F.2d 37 (9 Cir.),

cert. denied, 389 U.S. 822, 88 S.Ct. 48, 19 L.Ed.2d 74 (1967). Secondly, the Bensons charge that it was error to charge the jury in a single, oral count as to all defendants, amalgamating both the Securities Act claims and the common law claims. Considered alone, this does not constitute error. Only if some specific element was erroneously charged, allowing the jury to find liability where legally it could not, would there be reversible error here. The Bensons go no further than the bald allegation that consolidation of the charge was error. In addition, the trial court specifically instructed the jury that the decision as to each defendant was to be made separately; visible evidence that the jury heeded this instruction is that it found no liability on the part of one of the individual defendants.

■ The Bensons finally claim error in the admission of evidence of bogus postings, and in the trial court's permitting the jury to take into the jury room a scaled-down photograph of a reconstructed balance sheet of the Bensons' company. The Bensons did not object at trial to the admission of this evidence or the permission to the jury to take the scaled-down balance sheet into their deliberations. Thus, our review on this point must proceed under the plain error standard. We see no plain error here. These being the Bensons' only points of appeal, and there being no error, we affirm the judgment as to the Bensons.

### B.

■ Heller raises several complicated issues. First, Heller repeats the Bensons' first two challenges. For the reasons stated above, we find no merit in those challenges. Secondly, Heller claims that the trial court erroneously admitted into evidence the results of its May 24 examination of the Bensons' company. Heller says that the report is irrelevant to whether Heller (through its agent, Abrahams) made full disclosure in Abrahams' telephone conversation with Michelman. To this extent we agree, since the report was not prepared until the completion of the examination, well into June 1972. Nevertheless, we feel that the report was properly admitted as

evidence of undisclosed information that Heller might have had a duty to disclose when it received it. There was no error here.

Thirdly, Heller mounts a many-pronged attack on the specifics of the court's charge to the jury. The claimed errors lie in inaccurate instructions concerning actionability of omissions and opinions under Rule 10b–5, the standard of scienter under that Rule, the actionability of omissions and opinions under Alabama fraud, the burden of proof under that theory of liability, and the necessity of defendant's intent to induce plaintiff's action under Alabama fraud.

■ In reviewing a trial court's instructions to a jury in a trial such as this, we follow a standard test: We consider the challenged instruction as part of the entire charge, in view of the allegations of the complaint, the evidence presented, and the arguments of counsel, to determine whether the jury was misled and whether the jury understood the issues. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.*, 370 U.S. 19, 25, 82 S.Ct. 1130, 1134, 8 L.Ed.2d 305, 309 (1962); *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1100 (5 Cir. 1973); *Lyle v. R. N. Adams Constr. Co.*, 402 F.2d 323, 327 (5 Cir. 1968); *Garrett v. Campbell*, 360 F.2d 382, 386 (5 Cir. 1966); *Aetna Ins. Co. v. Paddock*, 301 F.2d 807, 812 (5 Cir. 1962). For purposes of analytical clarity, we consider separately the errors claimed under 10b–5 and those claimed under Alabama fraud.

### 10b–5
#### Omission

■ Heller asserts that the court erred in its charge as to when an omission may engender liability, by failing to state that an omission may produce liability only when the defendant bears a duty to disclose to the plaintiff.

The court's instruction on this matter provided:

What is a misstatement, or an omission of a material matter? What does that mean? Well, of course, it could be a direct misstatement, or misrepresentation. It could be calling something red when it's actually blue, so-to-speak, assuming color were material in a particular matter. That's a direct misrepresentation.

A misrepresentation can occur in effect by a half truth. And we have seen illustrations of this in our own common experience. If, for example, someone asked what is the color of the car I am about to buy, which I happen to see, and the other person says, well, it's a white and blue car. And it turns out it's white and blue polka dots, we might say perhaps that to simply describe it as white and blue while perhaps technically true it really was a half truth about the matter.

.    .    .    .    .

We talk about the omission to state something. We have some difficulties talking about reliance. For example, it's easy enough to say if somebody says the car is blue when it's red, it's easy enough to decide whether—or to require the plaintiff to show that he was really relying on that representation about color. Suppose, however, nothing is said about the color of a car. Assuming for the moment that that would be considered a material matter. Suppose there's no comment about the car, about the color of the car; how can it be said that the plaintiff in a particular case relied upon it not being a blue and white polka dotted car? We have to slightly change then maybe the wording of this item number five when we're talking about an omission rather than an actual misrepresentation or a half truth. What we're saying here is in the case of an omission to disclose something was the plaintiff generally relying upon getting full and fair disclosure of all relevant material facts? In the illustration about not being told about the blue and white polka dotted car, we would say does the plaintiff show, and this can be, of course, by circumstantial evidence as well as direct, that he was relying upon the salesman to have told him anything unusual about the color of the car. And it's sort of an indirect way then of having to prove this element because when something isn't represented you can't really prove that you relied upon the non-repre-

sentation.. About all you can say is change it a little bit and say we generally relied upon getting a full disclosure of the pertinent information, the pertinent material and information that this wasn't given and it was pertinent.

R. Vol. XIII at 4628, 4643–44. While this passage is ambiguous and appears to speak too broadly, we hold that on the particular facts of this case it was not reversible error. The evidence and counsel's arguments focused on three areas of potentially actionable omissions: first, alleged half-truths in Abrahams' statement to Michelman in failing to reveal that possibly bogus insurance claims had been posted on $180,000 of the Bensons' consumer loans, and that Heller had made substantial negative adjustments in the Bensons' reported asset value and net income; secondly, Heller's failure to inform Michelman of the abuses discovered in the May 1972 investigation; thirdly, Heller's failure to inform Bankshares of the abuses after Heller learned that Bankshares was planning to purchase the Bensons' company.

■■■ The jury could properly find a duty to disclose in any of these situations. As to the first, a duty to speak the full truth arises when a defendant undertakes to say anything. The jury could find that failure to disclose the insurance claims and the adjustments in assets and net income were failures to disclose the full truth. Concerning the second situation, it is clear that Heller did not know that Bankshares was the potential purchaser. But the jury had evidence that the Bensons were selling their company, and that Heller knew it, and that Michelman was the foremost finder in the nation in the field of consumer finance company acquisition.

The jury could also consider that Michelman's inquiry was more than an ordinary credit inquiry—it covered the Bensons' integrity, ability, and reputation for honesty. On the basis of this evidence the jury could find that Abrahams knew that Michelman was acting as broker to a potential purchaser of the Bensons' business. Heller had

much to gain by encouraging the sale of the Bensons' company because it has more than $3,000,000 at risk in Benson debt that was secured by accounts which were tainted with poor or dishonest accounting, and the Benson operation was losing money rapidly. The jury could find that acquisition by another company would relieve Heller of risk to its $3,000,000. Also, through its May 1972 examination of the Bensons' company, Heller obtained information strongly indicating gross inaccuracy in the Bensons' books. This information was not known to any potential purchaser and was designed by the Bensons not to be discovered. As matters stood, Heller had superior knowledge of inside information. On the basis of this information, the jury could find that Heller had a duty to disclose to Michelman the information uncovered by the May 1972 examination.

Thirdly, after the July 14 telephone conversation with Bankshares, Heller knew that Bankshares was involved heavily in purchase negotiations with the Bensons. From that knowledge and the other evidence listed above, the jury could find that Heller had a duty to make affirmative disclosure to Bankshares.

All of counsel's arguments on this point focused on whether Heller bore an affirmative duty to disclose. *See* R. Vol. XIII at 4361–65, 4537–40.

In addition, the court's instruction covering reliance on an omission (set out above) seems to incorporate a notion that an omission is actionable only if there is a duty to disclose. The discussion of reliance on omission centers on plaintiff's expectation of having received the entire truth. There can be such an expectation only if there is a correlative duty to disclose on defendant's part. For these reasons, we cannot say that the court's instructions here constituted reversible error.

### Opinion

Heller claims on appeal that the trial court's charge was too broad in permitting the jury to find 10b–5 liability on the basis of an opinion.[5] But Heller made no objec-

---

5. The court's instruction on this issue stated: Let me say here, I sort of skipped over it, that you look back under item number two that there's an alternate there that notes that

the material matter that we're speaking about, if it's in connection with the purchase or sale of stock actually can just be an opinion. The basic approach upon which this

tion at trial to this instruction as it related to 10b–5, so our standard of review is plain error, focusing on whether an uncorrected error here will result in a miscarriage of justice. *Industrial Development Board v. Fugua Indus., Inc.,* 523 F.2d 1226 (5 Cir. 1975). On the facts, the matter that might be characterized as an opinion lay in Abrahams' statements to Michelman.

■■■■ Particularly crucial is our characterization of Heller's statements to which this instruction could apply. The only such statements were Abrahams' responses to Michelman's inquiries. One of these was a representation as to a hypothetical event (that Heller would loan more money to the Bensons if they had not decided to sell). This should be classified as a fact, rather than opinion, for present purposes because Abrahams was, in effect stating how Heller's pending policies applied in the present case. Similarly, the statements that the Benson-Heller relationship had been satisfactory, that the Bensons ran an above-average operation, and has always met their obligations promptly, are to be seen as facts. These statements are akin to representations as to financial condition, which clearly are actionable. To be sure, these

statements reflect a certain amount of evaluation, but we feel that in this situation the statements resemble a recital of raw fact more than they resemble a prediction of future stock prices. Accordingly, the instruction challenged at this point may in fact have no application to Heller. We do not feel that the jury was misled. We find no error here.

### Scienter

■■■ Heller claims that the trial court erroneously charged the jury that Heller could be found liable if it was negligent in failing to discover the falsity of its statements. The court's written statement of the elements of liability listed, without qualification, negligence as a possible basis of liability. *See* point 3, Alternate B of the statement set out in text *supra.* The court further stated in its oral charge:

Another way the Plaintiff could satisfy this element number three is if there's evidence that although the Defendant may not have known or did not know the truth of the matter, nevertheless he should have known, he or it should have known. . . . I simply say here that as a substitute for the Plaintiff showing

---

loss started is that you have a cause of action, a claim against somebody only they have misrepresented a fact. If they said something is red when it's blue, so to speak. On the other hand, if the person merely says this is a beautiful blue color you are going to get, beautiful in a sense being an opinion kind of word, the law generally has said in its development that representing something is a beautiful color is really an opinion word and can't be relied upon or does not give rise to a cause of action if it turns out in effect not to be beautiful according to somebody else's opinion. And we are familiar generally with puffing, somebody trying to sell something, he builds up the item that he is trying to sell. And generally the law has said just because something is puffing and giving opinions, if it doesn't really relate to a fact then it can't be the basis for some later lawsuit.
Alternate A, however, points out that if it's in connection, if this misstatement or omission of a material matter is in connection with the purchase or sale of stock, it can be an opinion that would be the basis for the lawsuit or for the claim. It does not have to be a fact as such that is misrepresented.

I do caution you, however, that if it's an opinion that is the basis for the claim, you still would have to decide that that's a material matter that somebody's opinion is material in a particular case. And the way in which some statement is made will have some impact on several of these elements as we come to them. For example, although we're not to it the question of whether the Plaintiff reasonably relied upon something in part depends upon really what it is that's being said. Perhaps in a situation a Plaintiff might not be able to reasonably rely upon somebody saying, "Well, it's a beautiful blue color." So they tend to get interconnected, these elements. But I did want to point out to you that alternate A is that if it's—if the misstatement or omission of a material matter occurs in connection with the purchase or sale of stock then it can be sufficient if the matter misstated or not disclosed is an opinion and does not have to be actually a fact itself.

R. Vol. XIII at 4633–35.

actual knowledge by a Defendant it is sufficient if the Plaintiff proves to your reasonable satisfaction that a Defendant had both the means to discover the truth of the matter and a duty to investigate it. R. Vol. XIII at 4636–37.

The trial court should not have delivered this instruction. *See Hochfelder, supra; Smallwood, supra.* Still, we discern no reversible error here. The entire thrust of the presentation of evidence went to knowing or intentional misrepresentation, and counsel argued only on the basis of knowing intentional misrepresentation.

There was no reversible error in the instructions delivered as concerns 10b–5.

### Alabama Fraud

#### Omission

Though the verbal formulation governing the actionability of an omission under Alabama fraud differs from the 10b–5 formulation, we face precisely the same asserted error and facts under Alabama fraud as we have previously discussed under 10b–5. The court did charge on omissions as to Heller, and that charge does appear to be overly broad. But we do not believe that the jury was thereby misled as to its duty, since the complaint, the evidence, arguments, and other parts of the charge all focused on the proper question of duty.

#### Opinion

The court's written summary of elements allowed the jury to consider an opinion as the basis for liability if made "in connection

with the purchase or sale of stock." The oral charge does not alter this. The court did not indicate that "in connection with the purchase or sale" is an invocation of 10b–5 as opposed to Alabama fraud, at least as concerns opinions. Therefore, the jury charge included opinions in the elements of Alabama fraud.

Recognizing this, Heller makes the same attack on this instruction as it did in the 10b–5 context, claiming that it is too broad. But here, Heller made sufficiently specific objection at trial to permit us to review on a normal standard.

■ As was the case under 10b–5 rules, the only statement to which the "opinion" charge might refer in regard to Heller is not, under Alabama law, an "opinion." In *Ringer v. First National Bank,* 291 Ala. 364, 281 So.2d 261 (1973), the Alabama Supreme Court held that representations as to financial condition are actionable as facts, not as opinions. Opinions are actionable if made with the intent to deceive. Abrahams' statement to Michelman is similar to a comment on the Bensons' company's financial condition, and therefore we hold that it is actionable under Alabama law.

#### Burden of Proof

Heller asserts that the trial court erroneously instructed the jury that the plaintiff's burden of proof under the Alabama fraud count was to prove its case by a preponderance of the evidence.[6] The proper standard, claims Heller, requires proof by clear and convincing evidence.

---

**6.** The court instructed the jury:

There are charges in this case about fraud, and the law never presumes that someone is guilty of fraud. If the plaintiff is to prevail in this case, it must be that you are reasonably satisfied by a preponderance of the evidence, the credible evidence, that the plaintiff has established each of the material elements of its cause of action, or claim against the respective defendants.

This is a fancy phrase when I say must prove beyond a reasonable doubt by a preponderance of the credible evidence. What does that mean? Well, one way to say it is this: If, after looking at all of the evidence, direct and circumstantial, by whomever presented, that bear on a particular matter, evaluating that, giving credit where credit is due to be

given; if, after doing that, you find that the plaintiff's position on that matter is more probably true than not true, then the plaintiff has satisfied the burden of proof on that matter. More probably true than not true. This is a civil case. Does not require, for example, that the plaintiff, to prevail on a particular point, must prove something beyond any reasonable doubt. Something you have probably heard on television. But, in a civil case, it is sufficient insofar as meeting the burden of proof on a particular matter. If the plaintiff has proved that its position is more probably true than not true, and on that particular matter it's sustained its burden of proof.

R. Vol. XIII at 4620–21.

The charge plainly cast the burden of proof in terms of "preponderance of the evidence." But the court also stated that fraud is not to be presumed. The parties have not cited, and we have not found, any recent cases holding that the burden of proof for Alabama fraud is "clear and convincing evidence." Bankshares cites two old Alabama cases holding that the burden of proof for fraud is "preponderance of the evidence." Heller cites several more recent cases that declare that fraud must be shown by clear and convincing evidence.

■ On the state of Alabama law, we hold that the burden of proof is indeed a preponderance of the evidence. The "clear and convincing evidence" standard controls the quality or character of the evidence on which the jury may find fraud. We agree, of course, that the imposition of the "clear and convincing evidence" requirement makes the plaintiff's task more difficult than unadorned proof by a preponderance of the evidence.

■ We cannot say that the trial court erred in refusing to charge the jury along the lines of Heller's requested instruction, which was worded in terms of burden of proof. Furthermore, the court did tell the jury not to presume fraud. While an instruction noting the "clear and convincing evidence" standard would have been more satisfactory, we see no error.

*Intent to Induce Plaintiff's Action*

The court, in its written outline as well as in its oral charge, charged the jury that where defendant's misrepresentation was made in connection with the purchase or sale of a security, the defendant will be liable if it knew or should have known of the significance to the plaintiff of the information.[7] Heller correctly asserts that this charge applied to Heller. But the court also indicated that the "in connection with" condition on the relaxed level of intention applied only under the securities laws. Therefore, the court did not charge the jury under Alabama law that knowledge or negligence would satisfy this element. There is no error here.

We find no reversible error in the trial court's charge to the jury.

■ Fourth, Heller claims that the trial court erred in denying its motion for judgment n. o. v. Heller points to four areas, claiming that there was insufficient evidence that Abrahams' statements were false, that Heller had a duty to disclose under either 10b–5 or Alabama fraud, that Heller intended Bankshares to rely on its statements under Alabama fraud, and that the statements were made in connection with the purchase or sale of a security under 10b–5.

7. The jury charge on this issue provided:

Alternate number four. That this misstatement or omission was made with the intent to induce the Plaintiff to act. And alternative A comes on down and says if this is in connection with the purchase of [sic] sale of stock it's sufficient, if the significance was known or should have been known to the defendant.

Now, the basic statement of element number four assumes a situation where the defendant makes a statement with the idea and with the purpose and motive that that's going to help induce the plaintiff to act. And in our history, so to speak, that has been a required element before a plaintiff can recover on a claim such as this, that there must be proof, frequently circumstantial, that the motivation, so to speak, of the defendant was in making some statement or in not disclosing some fact there was in order to get the plaintiff to act to buy whatever it may have been. In view of the special securities laws some relaxation has been given to that requirement where it's in connection with the purchase of [sic] sale of stock. And the law says it's not necessary ultimately for the plaintiff to satisfy the jury that the defendant actually had that motive. If it's in connection with the purchase of [sic] the sale of stock it would be sufficient to reasonably satisfy the jury that the defendant knew or should have known that this was going to be of significance to the plaintiff in deciding its—his or its course of action even though the defendant may not have done it for the purpose of inducing the action. Nevertheless, if he either knew or under the circumstances should have known that this was a matter that was going to be of importance and significance to the plaintiff in his course of action in buying the stock, whatever it may have been like that, then this would satisfy element number four even though he may not have done it in order to get the plaintiff to act.

R. Vol. XIII at 4639–40.

In reviewing the trial court's denial of Heller's motion, we observe the standard established by *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5 Cir. 1969) (en banc), and therefore inquire whether the facts and inferences point so strongly and overwhelmingly in favor of Heller that reasonable men could not arrive at a contrary verdict.

On the basis of the evidence before it, the jury could find that Abrahams' statement to Michelman was fatally incomplete, or a half-truth, because of Abrahams' failure to delineate the Bensons' troubled financial situation. The jury could also find that Heller had a duty to make affirmative disclosure. *See* discussion of Heller's challenge to the trial court's instructions concerning the actionability of an omission, *supra*. The evidence supports a finding of intention to rely. In this area of ascertaining intent, proof is almost always circumstantial, as it is here. The precise question reduces to whether the jury could make a legitimate inference of intent. We believe that it could determine that Heller (or Abrahams, acting for Heller) intentionally refrained from conveying to Michelman or Bankshares the adverse information that it possessed concerning the Bensons' operations. Such manipulation of the facts communicated to Bankshares could indicate that Heller intended Bankshares to act upon its statements. Or so the jury could find, and we will not take that issue away from the jury on these facts.

Finally, the evidence presented in this case was sufficient to allow the jury to determine that any misrepresentation or actionable silence was "in connection with the purchase or sale of securities." All that must be shown is a causal nexus between the misrepresentation and the securities transaction. *Woodward v. Metro Bank, supra*. While this is a viable question here, we feel that the jury could determine that there was a causal relationship between Heller's statements and its undisclosed knowledge and Bankshares' agreement to merge with the Bensons' company.

We find no error in the district court's denial of Heller's motion for judgment n. o. v.

For the reasons stated above, we find no reversible error in the conduct or result of the trial below and therefore the judgment of the district court is, in all respects,

AFFIRMED.