[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 11, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-14681

_____

D. C. Docket No. 91-08652 CV-LCN

JAMES ZIEMBA, PATRICIA MACDOUGLE, et. al.,

Plaintiffs-Appellants,

versus

CASCADE INTERNATIONAL, INC., VICTOR G. INCENDY, et. al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 11, 2001)**

Before ANDERSON, Chief Judge, CARNES, Circuit Judge, and NANGLE*, District Judge.

ANDERSON, Chief Judge:

_____
* Honorable John F. Nangle, U.S. District Judge for the Eastern District of Missouri, sitting by designation.

# I.  INTRODUCTION

By way of an amended complaint filed in 1992, Plaintiffs, shareholders of Cascade International, Inc., ("Cascade"), brought this securities class action against Cascade officers and directors, including Victor Incendy, Cascade's President and CEO; Bernard H. Levy, Cascade's independent auditor; Coopers & Lybrand ("C&L"), an accounting firm; Gunster, Yoakley, & Stewart, P.A. ("GY&S"), a law firm; and others, alleging, inter alia, violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

In an Order dated December 16, 1993, the district court granted several defendants' motions to dismiss, including such motion filed by GY&S.  See In re Cascade Int'l Sec. Litig., 840 F. Supp. 1558 (S.D. Fla. 1993).  The district court denied C&L's motion to dismiss, except with respect to Plaintiffs' claims of negligent misrepresentation and common law fraud.  See id.  Plaintiffs filed a motion for entry of final judgment pursuant to Fed. R. Civ. Proc. 54(b) as to GY&S and other defendants.  This motion was denied.

In 1994, C&L filed a motion to reconsider the district court's ruling on C&L's motion to dismiss in light of Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S. Ct. 1439 (1994), in which

the Supreme Court held that a private plaintiff may not maintain an aiding and abetting suit under § 10(b). In an Order dated June 27, 1995, the district court granted C&L's motion to reconsider and dismissed Plaintiffs' § 10(b) claim against C&L in light of Central Bank. See In re Cascade Int'l Sec. Litig., 894 F. Supp. 437 (S.D. Fla. 1995). The district court also denied Plaintiffs' motion for leave to amend their complaint. See id. Plaintiffs filed a motion for entry of final judgment pursuant to Fed. R. Civ. Proc. 54(b) or 28 U.S.C. § 1292(b), which was denied.

After further proceedings,[1] final judgment was entered by the district court on September 30, 1999. On October 27, 1999, Plaintiffs filed a timely notice of appeal. They appeal only their claims against C&L and GY&S for primary liability under § 10(b) and the district court's denial of their motion to amend their complaint.

The finality of the September 30, 1999 Order renders the prior interlocutory orders appealable without Rule 54(b) certification. See Barfield v. Brierton, 883 F.2d 923, 930 (11th Cir. 1989) (noting that "the appeal from a final judgment draws in question all prior non-final orders and rulings which produced the

---

[1] Settlements with several defendants received final court approval in 1998 and 1999. Voluntary dismissals were granted as to several defendants prior to September 30, 1999. On September 30, 1999, the district court granted Plaintiffs' motion for entry of final default judgment as to Victor Incendy and Bernard Levy. The district court ordered the case closed and denied all pending motions as moot. A separate final default judgment was entered the same day.

3

judgment").  Thus, this Court has jurisdiction over this appeal.  See 28 U.S.C. § 1291.

## II. BACKGROUND FACTS

Accepting all well-pleaded facts in the complaint as true,[2] we assume the following facts.  Cascade became a public company in 1985.  At all relevant times, Cascade's stock was traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ") market under the symbol "KOSM." Cascade's primary business involved the formulation, manufacture, and retail sale of women's apparel, cosmetics, and fragrances.  Its activities were operated through numerous subsidiaries, including Jean Cosmetics; Boutiques Allison, Inc.; Fran's Fashions, Inc.; and Conston Corp.

By the close of Cascade's fiscal year ended June 30, 1987, Cascade was already reporting impressive gains through sales of cosmetics and women's apparel.  In each of its Form 10-Ks filed in 1989, 1990, and 1991, Cascade reported considerable growth and profits.  These 10-Ks contained statements by Cascade's independent auditor, Bernard Levy, in which he attested to the fact that he had conducted his audits of Cascade "in accordance with generally accepted

---

[2] At the motion to dismiss stage, we accept all well-pleaded facts as true, and all reasonable inferences therefrom are construed in the light most favorable to the plaintiff.  See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

4

auditing standards."

On August 20, 1991, the SEC wrote to Incendy, Cascade's President and CEO, stating that it was reviewing transactions by Cascade and/or its subsidiaries and requesting numerous documents, including a list of all stores and cosmetic counters operated by Cascade. In September 1991, rumors began to circulate that Cascade's reported profits were questionable. On October 1, 1991, the Overpriced Stock Service ("OSS") issued a report on Cascade, in which it stated that "the odds of trouble ahead" were "high." In mid-October, several class action lawsuits were filed. Cascade reported that there were "no negative developments" in its operations and said the suits were "without merit." It threatened litigation against market analysts who questioned the company's financial condition.

Then, on November 20, 1991, Cascade announced that its financial statements for the fiscal year ended June 30, 1991, "may not be accurate" and that it had been unable to locate Incendy for several days. The National Association of Securities Dealers halted trading in Cascade stock until the company could provide the public with accurate financial statements. On December 13, 1991, the newly appointed interim chair of Cascade, Aaron Karp, announced that the Cascade Board had authorized the filing of a bankruptcy petition under Chapter 11 of the United States Bankruptcy Code. Cascade and its subsidiaries subsequently filed

for bankruptcy protection. In a letter issued to Cascade shareholders in January 1992, Karp revealed that Cascade had materially misrepresented its assets, profits, and revenues and had issued millions of unauthorized shares of stock. On July 7, 1992, Plaintiffs filed this amended class action on behalf of purchasers of Cascade common stock between August 11, 1989, and November 19, 1991, inclusive.

## III. STANDARD OF REVIEW

The only issues on appeal are whether the district court erred in dismissing Plaintiffs' claims of primary liability under § 10(b) against C&L and GY&S, and whether the district court erred in denying Plaintiffs' motion for leave to amend their complaint. We review the dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure de novo. See Harris v. Ivax Corp., 182 F.3d 799, 802 (11th Cir. 1999). We review the district court's refusal to grant leave to amend for abuse of discretion, although "we review de novo the underlying legal conclusion of whether a particular amendment to the complaint would be futile." Id. For the reasons stated below, we affirm.

## IV. ALLEGATIONS

In their amended complaint, Plaintiffs allege the following with respect to GY&S and C&L:

## A. Allegations with respect to GY&S

1. GY&S represented Cascade on a variety of legal matters from the summer of 1989 through Incendy's disappearance in November 1991 and was retained to assist Cascade and Incendy in defending against those who raised questions about the truthfulness of Cascade's reported financial condition.

2. On January 15, 1991, GY&S sent Incendy a letter regarding an option agreement that Cascade had. GY&S told Incendy that all material information about Cascade's business and operations must be accurately reflected in Cascade's registration statement, and GY&S recommended that Cascade correct any inaccuracies in Cascade's recently filed prospectus. No corrections were made.

3. In the summer and fall of 1991, Cascade and Conston were considering a deal with Oleg Cassini. GY&S advised Cascade how to issue information to the public regarding the proposed deal. In June 1991, Cascade issued two press releases regarding a purported agreement that it and Conston had reached with Oleg Cassini. In the fall of 1991, GY&S was actively involved in trying to help Cascade and Conston "get out" of the purported agreement. GY&S made no effort to cause Cascade to issue any press releases disclaiming the June 1991 press releases.

4. The OSS published an article on October 2, 1991, raising questions about Cascade. On October 7, 1991, GY&S prepared, without "appropriate investigation or inquiry," a memorandum for Incendy suggesting statements that he could issue to the public in response to the OSS Report and Cascade's recent stock price decline. GY&S allegedly did nothing to assure itself of the factual accuracy of its proposed statements. Cascade then issued a document to the public that was based largely on GY&S's recommendations.

5. On October 2, 1991, in response to a request from Incendy, GY&S sent Incendy an opinion letter regarding the bankruptcy status of Conston. Despite its knowledge that Conston's Plan of Reorganization had been confirmed on April 18, 1991, GY&S

7

concluded that "there is no doubt that Conston is in bankruptcy." This letter enabled Incendy to justify the non-consolidation of Conston's financial statements with those of Cascade in 1991.

6. In October 1991, GY&S attorney Michael Platner spoke to stock analysts, who were allegedly spreading rumors about Cascade and advising people to sell Cascade stock short, and urged them to stop raising questions about Cascade.

7. On October 30, 1991, Cascade issued a press release in which it stated that it had instructed its attorneys to file suit against the OSS for trade defamation and various other claims. Cascade also stated that it believed there was a connection between the OSS Report and shortselling activity that was orchestrated by brokerage firm analysts. Although GY&S reviewed and approved the press release, it was drafted by a different law firm. GY&S knew from its legal research that a trade defamation suit would have "substantial difficulties," and it knew that its investigation had revealed no connection between shortsellers and the OSS Report.

8. On November 7, 1991, GY&S attorney Michael Platner wrote a letter to The Miami Review regarding an article that Platner heard was being prepared about Cascade. Platner claimed that there was no justification for printing such an incomplete and un-investigated article.

B. **Allegations with respect to C&L**

1. C&L audited Fran's Fashions' consolidated balance sheet and its consolidated statement of operations for the fiscal year ended June 29, 1991.

2. C&L issued an unqualified audit opinion in which it stated that its audit of Fran's Fashions had been conducted in accordance with

"generally accepted auditing standards" ("GAAS").[3] Plaintiffs allege that this statement was false and misleading because numerous auditing standards adopted by the American Institute of Certified Public Accountants ("AICPA") were violated. For example, they allege that C&L did not maintain an independence in mental attitude when conducting the audit; did not exercise due professional care in the performance of the examination and preparation of the report; did not obtain sufficient competent evidence to afford a reasonable basis for its audit opinion; and did not make reasonably adequate informative disclosures.

3. C&L audited Conston for the fiscal year ended March 2, 1991, and the short period ended June 1, 1991. On August 1, 1991, C&L issued an unqualified audit report which was included in Conston's Form 10-K filed with the SEC on August 30, 1991. This audit report stated that the audit had been conducted in accordance with GAAS.

4. C&L knew that Fran's Fashions and Conston were suffering tremendous losses and would require significant and immediate funds from Cascade in order to continue operating as going concerns, yet C&L made no attempt to verify independently Cascade's financial data, which had been prepared by Cascade's independent auditor, Levy. Plaintiffs allege that numerous "red flags" put C&L on notice that Cascade was incapable of providing Fran's Fashions and Conston with the required capital.

5. Plaintiffs allege that, had C&L properly conducted its audits of Fran's Fashions and Conston, it would have issued "going concern" qualifications in connection with both subsidiaries' financial

---

[3] Generally accepted auditing standards ("GAAS") are the standards prescribed by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA") for the conduct of auditors in the performance of an examination. See SEC v. Price Waterhouse, 797 F. Supp. 1217, 1222-23 n.17 (S.D.N.Y. 1992). Generally accepted accounting principles ("GAAP") comprise a set of basic accounting principles pertaining to business entities that are approved by the Financial Accounting Standards Board of the AICPA. See id. These principles establish guidelines for measuring, recording, and classifying a business entity's transactions. See id.

statements.

6. In the fall of 1990, Cascade asked C&L its opinion on whether Conston's financial statements needed to be consolidated with those of Cascade. In concluding that consolidation was not necessary, C&L purportedly relied on Financial Accounting Standard ("FAS") No. 94. Plaintiffs allege that C&L interpreted FAS No. 94 "too narrowly." By rendering such an opinion, Plaintiffs allege that C&L substantially furthered the Cascade fraud by allowing Cascade to omit Conston's poor financial results from its own.

7. C&L received a copy of Cascade's 1991 10-K shortly after it was filed with the SEC on September 27, 1991. The 10-K revealed that Conston's financial statements still had not been consolidated with those of Cascade. The 10-K also stated that there were 126 Fran's Fashions stores. Plaintiffs allege that C&L knew, or was reckless in not knowing, that only 70-80 such stores existed.

8. C&L did not withdraw its audit opinion on Conston's March 2, 1991, and June 1, 1991, financial statements until November 29, 1991. C&L did not withdraw its auditor's report for the consolidated financial statements of Fran's Fashions for the fiscal year ended June 29, 1991, until December 3, 1991.[4]

## V. STANDARD FOR PLEADING VIOLATIONS OF SECTION 10(b) AND RULE 10b-5

In their amended complaint, Plaintiffs allege that C&L and GY&S violated

Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated

---

[4] In their amended complaint, Plaintiffs also allege that, in October 1991, a British investment firm with large holdings in Cascade stock, Casenove & Co., contacted C&L in an effort to determine the truth or falsity of Cascade's public statements. C&L allegedly helped allay Casenove's fears and confirmed that all 126 of Fran's Fashions stores existed. Plaintiffs fail to allege reliance on C&L's alleged statement to Casenove in their amended complaint, and they make no reference to this allegation on appeal. Therefore, we do not consider this allegation.

thereunder.

## A. Section 10(b) and Rule 10b-5

Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange –
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (1997).

One of the rules adopted by the SEC, Rule 10b-5, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2000).

In order to state a claim under § 10(b) and Rule 10b-5, a plaintiff must show the following:  "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury." Bryant, 187 F.3d at 1281.  A showing of severe recklessness satisfies the scienter requirement.  See McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989).  "'Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" Id. at 814 (quoting Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc)).

## B.  Federal Rule of Civil Procedure 9(b)

In order to survive a motion to dismiss, Plaintiffs' claims of fraud under § 10(b) and Rule 10b-5 also must satisfy the requirements of Fed. R. Civ. P. 9(b). Rule 9(b) provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

12

Fed. R. Civ. P. 9(b).[5] "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" Durham v. Bus. Management Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988) (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)). The application of Rule 9(b), however, "must not abrogate the concept of notice pleading." Id. Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotation omitted).

## VI. DISCUSSION

In dismissing Plaintiffs' § 10(b) claim against GY&S, the district court held

---

[5] The Private Securities Litigation Reform Act of 1995, ("PSLRA"), 15 U.S.C. § 78u-4(b), expressly requires plaintiffs alleging violations of § 10(b) to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." However, we do not test the amended complaint in this case, filed in 1992, under the pleading requirements of the PSLRA, because that Act did not take effect until 1995.

that GY&S had no duty to disclose negative information about its client, Cascade, to third parties, such as Plaintiffs. On appeal, Plaintiffs argue that, even if GY&S had no independent duty to disclose the Cascade fraud to Plaintiffs, once GY&S made misleading statements of material fact, it had a duty to make a full and fair disclosure. While Plaintiffs admit that no statements attributable to GY&S were made directly to Plaintiffs, they argue that their allegations support GY&S's primary liability under § 10(b) because GY&S "played a significant role in drafting, creating, reviewing or editing allegedly fraudulent letters or press releases."

In dismissing Plaintiffs' § 10(b) primary liability claims against C&L, the district court concluded that, because Plaintiffs did not allege that C&L's audit reports of Fran's Fashions or Conston contained material misrepresentations or omissions, nor did Plaintiffs allege that C&L made assurances to the public about the accuracy of Cascade's financial statements, the only alleged activity of C&L that might possibly give rise to primary liability was C&L's failure to disclose that Cascade's 1991 10-K was misleading. However, the district court concluded that C&L had no duty to disclose the Cascade fraud, because "C&L did not hold itself out as Cascade's auditor and never made a public statement about the financial condition of Cascade." In re Cascade Int'l Sec. Litig., 894 F. Supp. at 443.

14

On appeal, Plaintiffs argue that C&L is primarily liable under § 10(b) because it incorrectly advised Cascade that its financial results did not need to be consolidated with Conston's; it failed to include "going concern" qualifications in its audit reports of Conston and Fran's Fashions; and it failed to disclose the alleged fraud contained in Cascade's 1991 10-K.

GY&S and C&L argue that they cannot be held primarily liable under § 10(b) in light of the Supreme Court's decision in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S. Ct. 1439 (1994), which abolished aiding and abetting liability under § 10(b). They also argue that they did not owe investors a duty to disclose the fraud surrounding Cascade because they never issued a statement to the public about Cascade on which Plaintiffs relied.

We conclude that the district court's orders dismissing Plaintiffs' § 10(b) primary liability claims against GY&S and C&L were appropriate and that the district court did not abuse its discretion in denying Plaintiffs' motion for leave to amend. We therefore affirm.

## A. **Central Bank**

Most of Plaintiffs' allegations concerning GY&S and C&L fail in light of the Supreme Court's decision in Central Bank. As that case is central to our analysis of Plaintiffs' claims, we recite the facts and holding of that case.

15

In Central Bank, the Colorado Springs-Stetson Hills Public Building Authority (the "Authority") issued $26 million in bonds to finance public improvements at Stetson Hills, a planned commercial and residential development in Colorado Springs. See 511 U.S. at 167, 114 S. Ct. at 1443. The bonds were secured by landowner assessment liens, and the bond covenants required that the land subject to the liens equal at least 160% of the bonds' outstanding principal and interest. See id. The bond covenants also required the developer of Stetson Hills, AmWest, to give Central Bank an annual appraisal verifying that the 160% test was met. See id. In 1988, AmWest provided Central Bank with an appraisal of the land securing the 1986 bonds and the land proposed to secure the 1988 bonds. See id. According to the developer's 1988 appraisal, the land values remained virtually unchanged from the 1986 appraisal, and thus the 160% test appeared to be met. Soon afterwards, Central Bank received a letter from a senior underwriter for the 1986 bonds. Noting that property values in Colorado Springs were declining and that the developer's appraisal was over 16 months old, the underwriter expressed concern that the 160% test was not being met. See id. Because Central Bank was named as indenture trustee, it was concerned that the 160% was not being met, and it asked its in-house appraiser to review the 1988 appraisal. After determining that the 1988 appraisal appeared overly optimistic,

16

the in-house appraiser suggested that Central Bank retain an outside appraiser to conduct an independent review.  See id. at 167-68, 114 S. Ct. at 1443.  However, after an exchange of letters between AmWest and Central Bank in early 1988, Central Bank decided to delay any independent review of the appraisal until the end of the year, approximately six months after the closing on the 1988 bond issue. The Authority defaulted on the 1988 bonds before the independent review took place.  See id. at 168, 114 S. Ct. at 1443.

After the default, the plaintiffs sought to hold Central Bank secondarily liable under § 10(b) based on a claim that Central Bank had aided and abetted a § 10(b) violation.  See id.  The district court granted summary judgment to Central Bank, and the Tenth Circuit reversed, holding that the plaintiffs had established a genuine issue of material fact regarding the recklessness element of aiding and abetting liability and that a reasonable fact-finder could conclude that Central Bank had rendered substantial assistance by delaying the independent review of the appraisal.  See First Interstate Bank of Denver, N.A. v. Pring, 969 F.2d 891 (10th Cir. 1992).

The Supreme Court granted certiorari and considered the question of whether § 10(b) liability extends to those who do not commit a manipulative or deceptive act within the meaning of § 10(b) but who instead aid and abet the

violation.  See Central Bank, 511 U.S. at 167, 114 S. Ct. at 1443.  After examining the text of the statute, the Supreme Court held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)."  Id. at 191, 114 S. Ct. at 1455.

The Supreme Court rejected the argument that the phrase "directly or indirectly" in § 10(b) covers aiding and abetting liability, because such an interpretation of the statute would extend liability to those "who do not engage in the proscribed activities at all, but who give a degree of aid to those who do."  See id. at 176, 114 S. Ct. at 1447.  The Court recognized that, if it were to allow recovery for aiding and abetting under § 10(b), a plaintiff could create liability "when at least one element critical for recovery under 10b-5 is absent:  reliance."  Id. at 180, 114 S. Ct. at 1449.  The Court stated:

> A plaintiff must show reliance on the defendant's misstatement or omission to recover under 10b-5.  Basic Inc. v. Levinson, 485 U.S. [224], 243, 108 S. Ct. [978], 989-90 [(1988)]. Were we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions.  See also Chiarella [v. United States], 445 U.S. [222], 228, 100 S. Ct. [1108], 1114 [(1980)] (omission actionable only where duty to disclose arises from specific relationship between two parties).  Allowing plaintiffs to circumvent the reliance requirement would disregard the careful limits on 10b-5 recovery mandated by our earlier cases.

Id. at 180, 114 S. Ct. at 1449-50.  Though it held that a private plaintiff may not maintain an aiding and abetting suit under § 10(b), the Supreme Court recognized

that this "does mean that secondary actors in the securities market are always free from liability under the securities Acts." Id. at 191, 114 S. Ct. at 1455.  Rather, "[a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met." Id.  (emphasis in original).

## B.  Post-Central Bank

Following Central Bank, the federal courts have split over the threshold requirement to show that a secondary actor, such as a lawyer or an accountant, is primarily liable under § 10(b).  Compare In re Software Toolworks, Inc., 50 F.3d 615, 628 n.3 (9th Cir. 1994) (holding that accountants may be primarily liable for statements made by others where the accountants reviewed the statements and played a significant role in the drafting and editing of the statements); Carley Capital Group v. Deloitte & Touche, L.L.P., 27 F. Supp. 2d 1324, 1334 (N.D. Ga. 1998) (holding that "a secondary actor can be primarily liable when it, acting alone or with others, creates a misrepresentation even if the misrepresentation is not publicly attributed to it"); In re ZZZZ Best Sec. Litig., 864 F. Supp. 960, 970 (C.D. Cal. 1994) (concluding that primary liability attaches to accounting firm that was

19

"intimately involved" in the creation of false documents) with Anixter v. Home-Stake Prod. Co., 77 F.3d 1215 (10th Cir. 1996) (rejecting "a rule allowing liability to attach to an accountant or other outside professional who provided 'significant' or 'substantial assistance' to the representations of others" and  holding that, to be liable, secondary actors "must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors"); Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) (holding that "a secondary actor cannot incur primary liability under the [Securities] Act for a statement not attributed to that actor at the time of its dissemination").

In order for a secondary actor, such as a law firm or accounting firm, to be primarily liable under § 10(b), the Plaintiffs "must show reliance on the defendant's misstatement or omission to recover under 10b-5." See Central Bank, 511 U.S. at 180, 114 S. Ct. at 1449 (citing Basic Inc. v. Levinson, 485 U.S. 224, 243, 108 S. Ct. 978, 989-90 (1988)).  Following the Second Circuit, we conclude that, in light of Central Bank, in order for the defendant to be primarily liable under § 10(b) and Rule 10b-5, the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant at the time that the plaintiff's investment decision was made. See Wright, 152 F.3d at 175. We apply the Central Bank principles first to the allegations made with respect to

20

GY&S and then to the allegations made with respect to C&L.

## C. Allegations Concerning  GY&S

### 1. *Misrepresentations*

In this case, with respect to the allegations concerning GY&S, Plaintiffs have not alleged any misstatements by GY&S upon which Plaintiffs relied. Indeed, Plaintiffs admit that no misrepresentations attributable to GY&S were ever made to Plaintiffs.  Instead, Plaintiffs base their claim on GY&S's "significant role in drafting, creating, reviewing or editing allegedly fraudulent letters or press releases."   Such allegations of substantial assistance in the alleged fraud were the kinds of allegations that were rejected in Central Bank.[6]  See, e.g., Wright, 152 F.3d at 171 (concluding that, under Central Bank, the plaintiffs who purchased stock in a company that issued a press release containing false and misleading information, with a notation that the information was unaudited and which did not mention the name of its outside auditor, could not recover from the auditor for its private approval of the information contained in the press release).

Plaintiffs argue that primary liability should attach to those who were never identified to investors as having played a role in the misrepresentations.  We

---

[6] We also note that, in 1995, Congress authorized the SEC to bring enforcement actions against one who "knowingly provides substantial assistance to another person" in violation of the federal securities laws.  See 15 U.S.C. § 78t(e) (West. Supp. 2001).  Noticeably, Congress did not create a private cause of action in this subsection.  See, e.g., Wright, 152 F.3d at 176.

21

disagree. To permit Plaintiffs' allegations against GY&S to survive a motion to dismiss would permit Plaintiffs to avoid the "reliance" requirement for stating a claim under Rule 10b-5. See Central Bank, 511 U.S. at 180, 114 S. Ct. at 1449 (recognizing that liability cannot attach "when at least one element critical for recovery under 10b-5 is absent: reliance"); Basic Inc., 485 U.S. at 243, 108 S. Ct. at 989 (noting that "reliance is an element of a Rule 10b-5 cause of action"). Holding GY&S primarily liable for its alleged conduct would "effectively revive aiding and abetting liability under a different name, and would therefore run afoul of the Supreme Court's holding in Central Bank." Wright, 152 F.3d at 175 (quotation omitted).

2. *Omissions*

We also conclude that GY&S is not primarily liable for any alleged material omissions. "[A] defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose." Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1043 (11th Cir. 1986). This Court has recognized that a duty to disclose arises not only "[w]here a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive," but also "'where the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case.'" Id. (quoting Woodward v. Metro

22

Bank of Dallas, 522 F.2d 84, 97 n.28 (5th Cir. 1975)). Some of the factors that we consider in determining whether a duty to disclose exists include: "the relationship between the plaintiff and defendant, the parties' relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant's awareness of plaintiff's reliance on defendant in making its investment decision, and defendant's role in initiating the purchase or sale." Id. (citing First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977)). Other factors that we consider include "the extent of the defendant's knowledge and the significance of the misstatement, fraud or omission," as well as "[t]he extent of the defendant's participation in the fraud." Id.

Consideration of these factors leads us to the conclusion that GY&S had no duty to make any disclosures to Plaintiffs concerning its client, Cascade. First, there was no attorney-client relationship between Plaintiffs and GY&S that might have created a fiduciary obligation on the part of GY&S towards Plaintiffs. See Chiarella v. United States, 445 U.S. 222, 230, 100 S. Ct. 1108, 1115 (1980) (noting that "silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b) . . .[,b]ut such liability is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction"); Schatz v. Rosenberg, 943 F.2d 485, 492 (4th Cir. 1991) (holding

23

"that unless a relationship of 'trust and confidence' exists between a lawyer and a third party, the federal securities laws do not impose on a lawyer a duty to disclose information to a third party"). Second, because of its fiduciary obligations to its client, Cascade, GY&S had certain privileges not to disclose information about Cascade. See Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir. 1986) ("Neither lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose. To the contrary, attorneys have privileges not to disclose.") (internal citations omitted). Third, as we have already noted, no statements attributable to GY&S were ever made to Plaintiffs; therefore, Plaintiffs could not have relied on GY&S in making their investment decisions. Cf. Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1045 (11th Cir. 1986) (where investors in a company sued the company's auditor for failure to disclose alleged fraud, we concluded that the plaintiffs could, consistent with their allegations, possibly prove a set of facts in which the auditor, whose audit reports had been included in the company's Private Placement Memorandum, could be held to have a duty to disclose). Finally, there are no allegations that GY&S solicited any purchase of Cascade securities or prepared any solicitation documents. Under these circumstances, we conclude that the district court correctly concluded that GY&S had no duty to disclose any fraud surrounding

24

Cascade to Plaintiffs.[7]

### D. Allegations Concerning C&L

Plaintiffs' allegations concerning C&L fall into three categories: (1) misadvising Cascade that its financial results did not need to be consolidated with those of Conston; (2) failing to include "going concern" qualifications in its audit reports of Conston and Fran's Fashions; and (3) failing to disclose the fraud allegedly suggested by Cascade's 1991 10-K.

1. *Advice Regarding Consolidation*

With respect to C&L's advice to Cascade not to consolidate Conston's financial statements with those of Cascade, Plaintiffs argue that, by rendering such advice, C&L "substantially participated" in the Cascade fraud by allowing Cascade to omit Conston's poor financial results from its own. This allegation fails to state a claim against C&L under § 10(b) for the same reasons that Plaintiffs' misrepresentation claim against GY&S fails: the absence of reliance. In reaching this conclusion, we note that Plaintiffs do not allege that any audit report prepared by C&L was ever contained in any of Cascade's public documents filed with the

---

[7] Indeed, in their initial brief on appeal, Plaintiffs appear to concede that GY&S had no independent duty to make any disclosures regarding the Cascade fraud. Therefore, their claim regarding GY&S's failure to disclose arises solely from GY&S's alleged prior misstatements. However, because we concluded, supra, that GY&S is not primarily liable for any alleged misstatements – because GY&S was never identified to investors and thus there was no reliance – Plaintiffs' claim regarding GY&S's alleged omission fails.

SEC.  Instead, Plaintiffs allege that Cascade's independent auditor, Bernard Levy,

prepared the audit reports contained in Cascade's public documents.  Were we to

permit liability to attach to C&L because of advice that it gave to Cascade, without

any allegation that such advice was attributed to C&L, we would permit Plaintiffs

to avoid the reliance requirement of  § 10(b) claims.  In light of Central Bank, we

hold that C&L's alleged substantial participation in the misrepresentation about

consolidation is not enough to state a claim under § 10(b).[8]

2.  *Going Concern Qualifications*

With respect to Plaintiffs' allegations regarding C&L's failure to include

---

[8]  We hold alternatively that Plaintiffs' allegations regarding C&L's advice not to consolidate Conston's financial statements with those of Cascade fail to satisfy the pleading requirements of Fed. R. Civ. P. 9(b).  Far from supporting Plaintiffs' allegation that C&L's advice was fraudulent, FAS No. 94 instead supports C&L's advice to Cascade that consolidated returns were not necessary.  Conston was in bankruptcy at the time that the advice was given, and FAS No. 94 states:

> A majority-owned subsidiary shall not be consolidated if control is likely to be temporary [or] if it does not rest with the majority owner (as, for instance, if the subsidiary is in legal reorganization or in bankruptcy or operates under federal exchange restriction, controls, or other governmentally imposed uncertainties so severe that they cast significant doubt on the parent's ability to control the subsidiary).

FAS No. 94 (as quoted in ¶ 145 of Amended Complaint).

"going concern" qualifications in its audit reports of Conston and Fran's Fashions,[9] we can assume arguendo, but we expressly do not decide, that there are some circumstances in which a shareholder of a parent company can prove a § 10(b) violation when a misstatement about a subsidiary is made. Nevertheless, Plaintiffs' allegations fail to state a claim because they do not satisfy the pleading requirements of Fed. R. Civ. P. 9(b).

According to the amended complaint, C&L audited Fran's Fashions for the fiscal year ended June 29, 1991, and issued an unqualified audit opinion stating that its audit had been conducted in accordance with GAAS. C&L also audited Conston for the fiscal year ended March 2, 1991, and the period ended June 1, 1991, and issued an unqualified audit report on August 1, 1991, which was included in Conston's 10-K filed with the SEC on August 30, 1991. This audit report also stated that the audit had been conducted in accordance with GAAS.

Plaintiffs allege that C&L's audit reports of Fran's Fashions and Conston were materially misleading because C&L violated auditing standards adopted by the AICPA and because C&L "knowingly or recklessly" omitted "going concern" qualifications for these Cascade subsidiaries. Plaintiffs allege that C&L knew that

---

[9] According to AU Section 341 of the AICPA Statements on Auditing Standards, a "going concern" qualification is used when there is "substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited . . . ."

27

Fran's Fashions and Conston were "in dire financial condition" and would need "significant, immediate funds" from Cascade in order to continue as going concerns during fiscal year 1992. Plaintiffs allege that, had C&L properly conducted its audits of Fran's Fashions and Conston, it would have issued "going concern" opinions in connection with both of these subsidiaries' financial statements, and the existence of such opinions would have required a similar opinion on Cascade's financial statements.

As part of Plaintiffs' argument relating to C&L's failure to include going concern qualifications, they allege that C&L violated numerous AICPA standards in auditing Fran's Fashions. For example, Plaintiffs allege that C&L did not maintain an independence in mental attitude when conducting the audit; did not exercise due professional care in the performance of the examination and preparation of the report; did not obtain sufficient competent evidence to afford a reasonable basis for its audit opinion; and did not make reasonably adequate informative disclosures.

"The Financial Accounting Standards of GAAP and the antifraud rules promulgated under § 10(b) of the 1934 Act serve similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated." Malone v. Microdyne Corp., 26 F.3d 471, 478 (4th Cir. 1994).

28

However, allegations of violations of GAAS or GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b). See, e.g., Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); In re Software Toolworks Inc., 50 F.3d 615, 627 (9th Cir. 1994) ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.") (quotation omitted); Melder v. Morris, 27 F.3d 1097, 1103 (5th Cir. 1994) ("boilerplate averments that the accountants violated particular accounting standards are not, without more, sufficient to support inferences of fraud"); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111,120 (2d Cir. 1982) (holding that allegations concerning violations of general accounting principles do not satisfy the requirements of Rule 9(b)). See also McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989) ("Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . .") (internal quotation omitted).

In order to plead fraud with sufficient particularity to satisfy Rule 9(b), plaintiffs must therefore allege more than mere violations of auditing standards.

Plaintiffs here attempt to allege "more" by pointing to "red flags" that C&L allegedly ignored when it issued its unqualified audit opinions on Fran's Fashions and Conston. Plaintiffs allege:

1. During the course of C&L's 1989 audit of Allison, another Cascade subsidiary, C&L questioned the paucity of workpapers that Levy provided it regarding an acquisition audit Levy had done.

2. C&L's 1989 workpapers contained a newspaper article that contained a photograph showing Levy as a member of the Cascade management team, which called into question Levy's independence.

3. C&L was asked to perform services that otherwise would have been the responsibility of Cascade's auditor, Levy.

4. A C&L employee sent Levy a checklist on procedures to follow in preparing a 10-Q, indicating that Levy needed assistance in preparing such a filing.

5. C&L was originally asked to audit Fran's Fashions for the fiscal year ended June 3, 1990, but this request was "mysteriously retracted," raising "the distinct possibility that the income statement was in fact never audited."

6. In the course of auditing Fran's Fashions and Conston in 1991, C&L saw no Jean Cosmetics counters, "calling into question the truth of [Cascade's] management's representations regarding Jean Cosmetics."

7. Levy was a sole practitioner rather than a large Big Six accounting firm.

8. Members of the Cascade Board had little or no retail clothing experience.

9. C&L knew Fran's Fashions had lost millions of dollars during the

30

fiscal years ended June 30, 1990, and June 29, 1991, and this made Cascade's reports of tremendous growth and profitability "highly suspect since Fran's Fashions constituted a material part of Cascade's business."

10.  C&L learned during its audit of Fran's Fashions that many of its accounts payable were long overdue.

11. C&L knew or recklessly disregarded that the person who signed Cascade's 1989 and 1990 10-Ks as CFO did not act in that capacity.

Taking all of these allegations as true, Plaintiffs have failed to satisfy the pleading requirements of Rule 9(b).  In certain circumstances, courts have held that allegations of violations of GAAP or GAAS, coupled with allegations of ignoring "red flags," can be sufficient to state a claim of securities fraud.  See, e.g., In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326, 1344-47 (S.D. Fla. 1999) (holding that plaintiffs pleaded fraud with sufficient particularity when they alleged that the accounting firm had been "tipped off" that Sunbeam had overstated its restructuring reserves and accounting firm ignored the information and issued its unqualified audit opinion); In re Ikon Office Solutions, Inc. Sec. Litig., 66 F. Supp. 2d 622, 629-30 (E.D. Pa. 1999) (concluding that allegations that accounting firm was informed at an Auditing Committee Meeting that Ikon's CFO was "cooking the books" and accounting firm's failure to investigate this and other information about accounting problems supported a claim of reckless behavior by accounting firm); In re Health Management, Inc. Sec. Litig., 970 F. Supp. 192, 203 (E.D.N.Y.

1997) (holding that violations of auditing principles accompanied by ignorance of "red flags," including an analyst's letter warning the accounting firm of artificially inflated accounts receivable, was sufficient to create a strong inference of recklessness).

In this case, however, Plaintiffs have not alleged any facts suggesting actual awareness by C&L of any fraud. Plaintiffs have pointed to no "tips," letters, or conversations raising inferences that C&L knew of any fraud. Furthermore, Plaintiffs have pointed to no facts suggesting that C&L was severely reckless in not knowing about any fraud.

Plaintiffs' purported "red flags" consist of C&L's alleged possession of documents and other information which Plaintiffs allege should have revealed the need for going concern qualifications in C&L's audit opinions of Fran's Fashions and Conston. At most, these allegations raise an inference of gross negligence, but not fraud.

In order for Plaintiffs to survive a motion to dismiss on their claim regarding C&L's failure to include going concern qualifications in its audit reports of the two Cascade subsidiaries, we would have to infer several conclusions: (1) that Fran's Fashions and Conston had a need for capital infusion; (2) that the capital infusion had to come from Cascade; (3) that C&L therefore had a duty to investigate

32

Cascade; and (4) that such investigation would have disclosed all of the ugly facts later revealed about Cascade. On the basis of the allegations here, this series of inferences is too tenuous to amount to one of "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." McDonald, 863 F.2d at 814 (quotation omitted).

Although Plaintiffs generally allege a duty on the part of C&L to investigate Cascade, they point to no accounting principle which clearly sets out such a duty. Plaintiffs argue that AU Section 341 (relating to an auditor's consideration of an entity's ability to continue as a going concern) establishes such a duty. Section 341 provides generally that an auditor has a responsibility to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern for a reasonable period of time. However, a careful reading of that section reveals that it sets forth no bright-line duties, and it certainly does not even mention any duty of an auditor of a subsidiary to audit or investigate the parent. The language of the general duty to evaluate whether there is "substantial doubt" indicates that there are no bright lines and that discretion is necessarily involved. We doubt that the sparse allegations here rise to the level of stating with particularity a violation of AU Section 341. But we need hold only that Plaintiffs have failed to allege a

33

highly unreasonable misrepresentation or omission which constitutes an extreme departure from standards of ordinary care. Especially in light of the disclosures actually made, see infra, we readily so hold.

In addition to the lack of particularity of Plaintiffs' allegations, especially as to the circumstances which allegedly gave rise to an omitted duty and the manner in which the alleged statements or omissions were misleading, we believe that the disclosures actually made by C&L significantly undermine any hint of fraud. With respect to the challenged financial statements for Fran's Fashions for the fiscal year ended June 29, 1991, which were audited by C&L, these statements disclosed a negative net worth and significant losses. With respect to the challenged March 2, 1991, and June 1, 1991 financial statements for Conston, which were audited by C&L, these statements disclosed that Conston had experienced operating losses in prior years and was in bankruptcy until April 18, 1991, and that Conston's "continued existence [was] dependent upon its ability to substantially achieve its plan of reorganization." With respect to Plaintiffs' alleged "red flags" relating to C&L's knowledge of losses and overdue accounts payable of subsidiaries, we thus conclude that C&L did in fact disclose the substance of the alleged "red flags." With respect to the alleged "red flags" relating to Levy, we readily conclude that they suggest negligence at most. Plaintiffs' few remaining allegations of "red

34

flags" similarly can support nothing more than negligence.

Therefore, assuming <u>arguendo</u> that there are some circumstances in which a shareholder of a parent company can prove a § 10(b) violation when a false or misleading statement about a subsidiary is made, Plaintiffs' allegations related to C&L's audit reports of Fran's Fashions and Conston nevertheless fail to satisfy the pleading requirements of Rule 9(b).

### 3. *Omission*

Plaintiffs assert a failure to disclose, or a material omission, on the part of C&L with respect to Cascade's 1991 10-K. According to Plaintiffs' allegations, C&L received a copy of Cascade's 1991 10-K shortly after it was filed with the SEC on September 27, 1991. Plaintiffs allege that C&L should have noticed the following errors with respect to Cascade's 10-K: that Conston's financial statements still had not been consolidated with Cascade's; and that the 10-K erroneously indicated that there were 126 Fran's Fashions stores when C&L should have known that there were only 70-80. With respect to the failure to consolidate Conston's financial statements with those of Cascade, Plaintiffs allege that C&L should have known that this was error, because C&L knew that by this time Conston was no longer in bankruptcy. Plaintiffs allege that C&L should have noticed these errors, and Plaintiffs argue that C&L had a duty to disclose these

35

errors by withdrawing its audit reports for Fran's Fashions and Conston.[10]

We readily conclude that Plaintiffs have failed to allege fraud in this regard with the necessary particularity.  We note that Plaintiffs do not allege that any affirmative misrepresentations in Cascade's 1991 10-K were attributed to C&L. Levy, not C&L, was Cascade's independent auditor; it was Levy who prepared the auditor's report contained in Cascade's 1991 10-K.  Therefore, Plaintiffs relied on Levy, not C&L, for the accuracy of Cascade's 1991 10-K.

We also do not understand that the alleged errors in Cascade's 1991 10-K somehow rendered C&L's previous audit reports of Fran's Fashions and Conston untrue or misleading.  Plaintiffs do not allege that, nor do they explain why that might be the case.  Nor did anything in the 10-K render untrue or misleading C&L's private advice to Cascade in November 1990 that consolidation of Conston's financial statements was not necessary because it was in bankruptcy at that time.  Moreover, the fact that C&L gave this private advice to Cascade never made its way into the public domain, and, accordingly, there was no reliance by investors on C&L in this regard.

We also note that Plaintiffs seem to assume some duty on the part of an

---

[10]  C&L did in fact withdraw its audit report with respect to Conston on November 29, 1991, and with respect to Fran's Fashions on December 3, 1991, in each case shortly after Cascade announced on November 20, 1991, that Cascade's financial statements might be inaccurate and that it had been unable to locate Incendy for several days.

auditor to continue to monitor the public statements and filings not only of its own client, but also of its client's parent. However, Plaintiffs' complaint points to no accounting principle that imposes such a duty. Nor does Plaintiffs' brief cite case law imposing such a duty.[11]

Finally, with respect to other factors listed by Rudolph as relevant in the duty to disclose analysis, see 800 F.2d at 1043, we note that there are no allegations that C&L initiated the purchase or sale of Cascade securities, nor that C&L derived any benefit from the purchase or sale of such securities.

Essentially, Plaintiffs argue that C&L should be liable under § 10(b) because it did not withdraw its audit reports immediately after the September 27, 1991 filing of Cascade's 10-K, waiting instead until November 29 and December 3, 1991. In light of the foregoing considerations, we have considerable doubt that C&L had a duty to disclose arising from the alleged errors in Cascade's 1991 10-K.[12] However, we need make no such definitive ruling in this case.[13] Rather, given

---

[11] We note below that, in this case, we need not make a definitive holding with respect to any duty to disclose on the part of C&L. For similar reasons, we need not make any definitive ruling with respect to the suggested continuing duty to monitor subsequent public filings. Suffice it to say that, even if there were such a duty, Plaintiffs have failed to allege with the necessary particularity the contours of such a duty or the underlying facts which would constitute such an extreme departure from the standards of ordinary care as to state a viable fraud claim.

[12] The facts of this case would seem to fall within the general rule referred to in Rudolph that there is no "'continuing duty to keep investors apprised of adverse developments long after the date of the certified report.'" 800 F.2d at 1044 (quoting Ingenito v. Bermec Corp., 441 F. Supp. 525, 549 (S.D.N.Y. 1977)). As Rudolph noted: "It would be asking too much to expect

37

the lack of particularity of Plaintiffs' allegations with respect to the failure of C&L to withdraw its previous audit reports of Fran's Fashions and Conston immediately after the September 27, 1991 filing of Cascade's 10-K, and given the vagueness of the duty, if any, which C&L is alleged to have breached, we hold that Plaintiffs have failed to satisfy the particularity requirements of Rule 9(b).

### E. Leave to Amend

Plaintiffs also argue that the district court erred in denying them leave to amend their complaint in order to make additional allegations regarding C&L's conduct. The district court denied Plaintiffs' motion for leave to amend, concluding that the additional allegations would not state a claim under § 10(b).

We have recognized that, "[w]here it appears a more carefully drafted complaint might state a claim upon which relief can be granted, . . . a district court should give a plaintiff an opportunity to amend his complaint instead of dismissing it." Bank v. Pitt, 928 F.2d 1108, 1112 (11th Cir. 1991). However, "if a more carefully drafted complaint could not state a claim . . ., dismissal with prejudice is proper." Id.

---

accountants to make difficult and time-consuming judgment calls about the nature of routine facts and figures turned up after a report has been completed." Id. at 1044.

[13] Thus, we need not address whether there may be some circumstances in which the auditor of a subsidiary might have a duty to disclose upon which the shareholders of a parent could base a § 10(b) claim.

In their brief to this Court, Plaintiffs set forth eleven additional allegations which they claim would further demonstrate C&L's "scienter" and "the existence of a duty to disclose on the part of [C&L] under Rudolph." However, after careful review of these additional allegations, and in light of Rule 9(b) and Central Bank, we conclude that the district court did not err in denying Plaintiffs' motion for leave to amend. See Pitt, 928 F.2d at 1112.

## VII. CONCLUSION

We agree with the district court that Plaintiffs' amended complaint fails to state a claim against GY&S and C&L for primary liability under § 10(b). We also hold that the district court did not abuse its discretion by denying Plaintiffs' motion for leave to amend. Accordingly, the judgment of the district court is AFFIRMED.